Kelly M. Dermody (State Bar No. 171716)
kdermody@lchb.com
Michelle A. Lamy (State Bar No. 308174)
mlamy@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Rachel Geman
rgeman@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  212.355.9500
Facsimile:  212.355.9592

Allen Carney
acarney@cbplaw.com
David Slade
dslade@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
519 W. 7th Street
Little Rock, AR  72201
Telephone:  501.312.8500
Facsimile:  501.312.8505

Michael J. Flannery
mflannery@cuneolaw.com
CUNEO GILBERT LADUCA, LLP
7733 Forsyth Boulevard, Suite 1675
Clayton, MO 63105
Telephone:  314.226.1015
Facsimile:  202.789.1813

Matthew Prewitt
mprewitt@cuneolaw.com
CUNEO GILBERT LADUCA, LLP
16 Court Street, Suite 1012
Brooklyn, NY 11241
Telephone:  202.789.3960
Facsimile:  202.789.1813

Jay Angoff
jay.angoff@findjustice.com
MEHRI & SKALET
1250 Connecticut Avenue, NW
Suite 300
Washington, D.C. 20036
Telephone:  202.822.5100

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| MOHAMMED AZAD and DANIELLE BUCKLEY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TOKIO MARINE HCC – MEDICAL INSURANCE SERVICES GROUP, HEALTH INSURANCE INNOVATIONS, INC., HCC LIFE INSURANCE COMPANY, and CONSUMER BENEFITS OF AMERICA,<br><br>Defendants. | Case No.  3:17-cv-618<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs Mohammed Azad and Danielle Buckley ("Plaintiffs"), on behalf of themselves and all others similarly situated, individually and as class representatives, bring this action against defendants Tokio Marine HCC – Medical Insurance Services Group, HCC Life Insurance Company, Health Insurance Innovations, Inc., and Consumer Benefits of America ("Defendants"). Plaintiffs' allegations are based upon information and belief, except for the allegations concerning Plaintiffs' own actions.

## I.   NATURE OF THE ACTION

1.     This is a class action against Defendants, seeking declaratory and injunctive relief, equitable relief, and damages.

2.     Plaintiffs challenge a common course of conduct by Defendants in their marketing and issuance of health insurance policies, and their claims processing, administration, customer service thereunder. Through their common course of conduct, Defendants have violated the laws of the State of California.

3.     Defendants issue, market, and administer healthcare policies that do not comply with the California Insurance Code and other statutory and common law. Defendants market the policies in a misleading manner and fail to disclose relevant facts about the insurance in their sole possession, train their customer service personnel in a uniform way to make materially false and misleading statements to policyholders seeking to make claims, and breach the terms of their contracts by, among other things, delaying, refusing to pay, and obstructing policyholders' claims in bad faith. Thousands of policyholders, including Plaintiffs, have been harmed by Defendants' systematic abuses.

## II.   PARTIES

4.     Defendant Tokio Marine HCC – Medical Insurance Services Group ("HCC") is a limited liability company with its headquarters at 251 North Illinois Street, Suite 600, Indianapolis, Indiana 46204. HCC, which was established in 1998, was a subsidiary of HCC Insurance Holdings, Inc. until 2015. In 2015, HCC Insurance Holdings, Inc. was acquired by

1333194.11

1  Tokio Marine Holdings and renamed Tokio Marine HCC.  Today, HCC is a part of the Tokio

2  Marine HCC group of insurance company entities.

3    5.    Defendant HCC Life Insurance Company is a subsidiary of Tokio Marine

4  Holdings, LLC and has its principal place of business at 225 TownPark Drive, Suite 350

5  Kennesaw, Georgia 30144.

6    6.    Defendant Health Insurance Innovations, Inc. ("HII") is a publicly-traded

7  Delaware corporation, with its corporate headquarters at 15438 N. Florida Avenue #201, Tampa,

8  Florida 33613.  HII has been selling health insurance contracts since 2008.

9    7.    Defendant Consumer Benefits of America ("CBA") claims to offer discount

10  services and benefits to group members, and has its principal place of business at 3190 Union

11  Street, Lakewood, Colorado 80215.

12    8.    Plaintiff Mohammed Azad is a United States citizen domiciled in Hayward,

13  California.  He contracted with HCC for a short-term insurance policy on December 8, 2015,

14  which policy continued until March 2016.  Plaintiff Azad also had a short-term, 6-month policy

15  with HCC beginning on or about August 28, 2013, which continued until early 2014.

16    9.    Plaintiff Danielle Buckley is a United States citizen domiciled in Kern County,

17  California.  She contracted with HCC for a short-term insurance policy on April 1, 2016, which

18  policy continued through September 2016.

19  **III.    JURISDICTION AND VENUE**

20    10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

21  § 1332 because Plaintiffs and Defendants are of diverse citizenship, and pursuant to 28 U.S.C.

22  § 1332(d)(2), because this is a class action in which the aggregate amount in controversy exceeds

23  five million dollars ($5,000,000.00), exclusive of interest and costs; there are at least one hundred

24  (100) class members; and at least two-thirds of the members of the putative class are citizens of a

25  state other than Defendants.

26    11.    This Court has personal jurisdiction over Defendants because they have conducted

27  systematic and continuous business activities in and throughout the State of California, including

28

1333194.11

1  in the Northern District, by entering into health insurance agreements with Plaintiffs and the

2  members of the Class.

3       12.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391 because

4  Defendants conduct business in California, and because a substantial portion of the events giving

5  rise to these claims occurred in this District, including the events related to Plaintiffs' claims.

6  **IV.    INTRADISTRICT ASSIGNMENT**

7       13.      This case is properly assigned to the San Francisco/Oakland Division, pursuant to

8  Civil L.R. 3-2(c) and 3-5(b), because a substantial part of the events or omissions that give rise to

9  Plaintiffs' claims occurred in the counties identified therein, including the events related to

10  Plaintiff Azad's claims.

11  **V.    FACTUAL ALLEGATIONS**

12       14.      The parent company of Defendant HCC, Tokio Marine HCC, is a specialty

13  insurance group that underwrites more than 100 classes of specialty insurance.  Tokio Marine

14  HCC has offices in at least the United States, the United Kingdom, Spain, and Ireland and

15  transacts business in approximately 180 countries around the world.

16       15.      Defendant HCC is a service company and a member of the Tokio Marine HCC

17  group of companies.  According to its website, HCC is regulated by the State of Indiana as a

18  Third Party Administrator.

19       16.      Defendant HCC Life Insurance Company is a subsidiary of Tokio Marine

20  Holdings, LLC and the underwriter of HCC's short-term insurance policies complained of

21  herein.[1]

22       17.      Defendant HII is a developer and administrator of low-cost, web-based individual

23  health insurance plans and ancillary products.  HII claims that it simplifies the insurance policy

24  application process using electronic communication with carriers, enabling licensed agents to

25  provide consumers with access to insurance products backed by carriers, such as HCC.  HII is

26  liable for some or all of the unlawful conduct related to the HCC-underwritten contracts that it

27

28

---

[1] All subsequent references to "HCC" include both Tokio Marine HCC – Medical Insurance Services Group and HCC Life Insurance Company.

1333194.11

sold or entered into, because it is a close affiliate of HCC, cooperating in the sale, administration, and/or servicing of HCC policies, with knowledge of HCC's practices.  The full nature and extent of cooperation and interaction between HII and HCC is unknown to Plaintiffs and can only be determined through discovery.

18.     Defendant CBA purports to be an organization devoted to "providing quality discount services and benefits to its members for 30 Years. . . .  CBA utilizes group buying power to negotiate the best services and prices for you, our members."[2]  CBA's website states that not only is it "committed to saving members money on everyday items like restaurants and movie tickets," it can also "help you protect yourself and your family in the event an accidental injury should happen."[3]  However, the "benefits" listed on its website relate only to legal care, online dining certificates, online fitness and nutrition, movie ticket savings, theme park discounts, discount tires and rims, budget truck rental, discount magazines, and a quarterly online newsletter.[4]

A.     **Plaintiffs' Experiences**

1.     **Plaintiff Azad**

19.     Plaintiff Mohammed Azad purchased a short-term insurance policy with HCC on or about December 8, 2015.  After conducting an online search for health insurance, Azad was directed to the website for a broker, Insurance Care Direct (http://www.insurancecaredirect.com/).

20.     Azad communicated with Insurance Care Direct's broker by telephone.  The application process was entirely verbal, with all representations regarding the policy being made to Azad over the phone.

21.     Azad never signed his application or policy, electronically or otherwise.  Instead, he was asked to provide a "verbal signature" to his over-the-phone application.

22.     Upon completing the application for his policy, Azad received an email confirming coverage under the HealtheMed STM plan—a plan offered and marketed jointly

---

[2] *See* "Home," http://www.consumerbenefits.com/index.html.
[3] *Id.*
[4] *See* "Benefits," http://www.consumerbenefits.com/benefits.html.

1333194.11

between HCC and HII.[5]   The email informed Azad that, following approval of his application and processing of an initial payment of $336.56, his coverage would be effective December 9, 2015.

23.     The December 8, 2015 email further stated that Azad would have ten calendar days to cancel his policy, but would not receive a letter including his plan ID card and explanation of benefits until 7-10 business days from the date of the email.  Azad did not receive his plan documents (including an explanation of coverage) until December 21, 2015.[6]

24.     Azad paid premiums of $126.61 per month for his policy.

25.     Within a two-week period in December 2015, Azad suffered three, separate health incidents, each necessitating a visit to the emergency room at St. Rose Hospital in Hayward, California.[7]   During each visit, the hospital contacted HCC.  Similarly, during each visit, Azad presented his HCC card.

26.     Despite claims being filed for each ER visit, and for such visits falling within the scope of Azad's policy with HCC, Defendants refused to pay any of the claims.  Instead, on January 14, 2016, HCC sent Azad a letter stating that it would not give "any further consideration…to this claim" unless and until Azad supplied expansive records of his medical history and related information.  HCC sought "all medical records, provider notes, and labs from 12/09/2010 through to present date."  The letter further instructed Azad to "return this letter with the requested information to our office within 45 days of the date of this letter and, upon receipt, we will make a determination within 30 days."[8]

27.     Subsequently, and on myriad occasions from January to June 2016, Azad called the customer service number for HCC in an effort to provide sufficient information to process his claims.  No matter how much information he provided, he was always told to provide more.

[5] *See* HII Press Release, *Health Insurance Innovations Partners With HCC Like Insurance Company to Expand Short-Term Medical Portfolio*, (Jun. 3, 2013) (http://investor.hiiquote.com/releasedetail.cfm?ReleaseID=775244) ("HII's new short-term medical plan with HCC [HealtheMed] is being launched in 45 states and will enhance our national presence by providing a competitive product that meets the needs of today's consumers.")

[6] The December 8, 2015 email also provided information about how to create an online account with HCC.

[7] They were, respectively: a panic attack, vasovagal syncope, and chest pains.

[8] No address was specified.

1333194.11

28.     Frustrated with HCC's refusal to pay any of his claims, Azad cancelled his policy in March 2016 (although he continued to appeal HCC's denial of his above-described claims through June 2016).  Azad never received any refund of his premiums, and Defendants never paid any of Azad's claims.  Ultimately, Azad paid his medical bills himself.

### 2.     Plaintiff Buckley

29.     Plaintiff Danielle Buckley's husband purchased a short-term insurance policy with HCC—for himself, Plaintiff Buckley, and their children—on or about April 1, 2016.  The monthly premium was approximately $850.

30.     Subsequently, Buckley experienced swelling around her face and sought medical treatment on or about June 17, 2016, at Accelerated Urgent Care, in Bakersfield, California.

31.     Buckley was diagnosed with a staph infection, and underwent three treatments for intravenously-administered antibiotics on June 16, 17, and 18, 2016, respectively.

32.     Buckley presented her HCC insurance card at the time of her visits to Accelerated Urgent Care.

33.     Following her treatment, Buckley was made aware of the fact that HCC had not paid her claims.  Buckley then contacted HCC, who asked for her medical records for the past five years.  Upon being pressed by Buckley, HCC informed her that it only needed the records of her family doctor, and that HCC would contact her family doctor's office.

34.     Buckley continued to receive bills from Accelerated Urgent Care, including letters threatening to turn her account over to collections.  Buckley once again contacted HCC, and simultaneously contacted her family practitioner confirming that her family practitioner was ready and willing to provide all necessary records.

35.     On July 27, 2016, Buckley received a letter from HCC stating, "[t]his letter is to notify you that additional information was previously requested of you or one of your medical providers; however this information is still outstanding.  Before any further consideration can be given to your claim, all requested information must be submitted."  While this letter did not specify which information was sought, it further instructed Buckley to "return this letter with the

1333194.11

1    requested information to our office within 15 days of the date of this letter, and upon receipt, we

2    will make a determination within 20 days."

3        36.    Buckley subsequently received several "explanation of benefits" letters from HCC

4    on or about August 29-30, 2016, stating that her claims had been closed, "due to a lack of

5    requested information from the provider(s)."

6        37.    Buckley and her family cancelled their policy with HCC on or about September

7    29, 2016, upon signing up for a new insurance plan with a different provider.

8        38.    At present, Buckley has approximately $3,500 in unpaid medical bills due to

9    Accelerated Urgent Care, stemming from unpaid claims filed with HCC for the treatments of June

10   17-19, 2016.

11       **B.    Defendants Work with Unlicensed Brokers and Employ Tactics Designed to
             Mislead Policyholders.**

12

13       39.    Plaintiffs who did not purchase their policies directly from HCC purchased their

14   health insurance policies through brokers who market and sell HCC health insurance policies.

15   These brokers, whom HCC and/or HII refer to as "Producers," held themselves out to be licensed

16   insurance brokers.  HCC and/or HII pays its Producers commissions, in some cases 20%, for any

17   premiums received on Producer-attained policies.

18       40.    HCC and/or its Producers offer several short-term insurance policies on behalf of

19   HCC, ranging from six- to eleven-months in coverage and with varying deductible options and

20   coverage maximums.  Each of these policies, however, contains a host of exceptions to coverage

21   that are not articulated to consumers prior to or during the application process.  Indeed, HCC's

22   promotional materials and its application form make representations to applicants that coverage is

23   much more expansive than it really is.

24       41.    HCC's most unconscionable carveout of coverage is for pre-existing conditions,

25   which as discussed below, is applied with absurd results.  However, HCC's promotional materials

26   and application form make multiple, materially-misleading statements that lead a customer to

27   believe that its carveouts are much more cabined than they actually are.

28

1333194.11

1   42.   For example, HCC's website purports to contain an exemplar brochure for its

2   short-term insurance product issued in California ("California Brochure" or "Brochure"),[9] which

3   makes the general representation that the company will honor its claims:

4   **After purchasing coverage, how can I trust the company to be there if I need them?**

5   For more than 30 years, HCC Life Insurance Company has been leading the way in medical stop loss insurance for

6   employers who self-fund their employee benefit plans. HCC Life's products, including medical stop loss, HMO

7   reinsurance, medical excess, group term life insurance and short term medical insurance are backed by the financial

8   stability of its parent company, HCC Insurance Holdings, Inc. (NYSE: HCC). HCC Life holds a financial strength

9   rating of AA (Very Strong) by Standard & Poor's and Fitch Ratings and A+ (Superior) by A.M Best Company.

10

11   California Brochure at 2.

12   43.   The California Brochure further provides an illustrative list of events purportedly

13   covered by HCC's short-term policies:

14   **HCC Life Short Term Medical Covers:**

15   • Inpatient and outpatient charges made by a hospital, including inpatient prescription drugs

16   • Charges incurred at an urgent care center after a $50 co-pay

17   • Charges made by a physician, surgeon, radiologist, anesthesiologist, and any other medical specialist to

18   whom the physician has referred the case

19   • Charges made for dressings, sutures, casts or other supplies prescribed by the attending physician

20   or specialist, but excluding nebulizers, oxygen tanks, diabetic supplies and all devices for repeat use at home

21   • Charges for diagnostic testing using radiology ultrasonographic or laboratory services

22   • Charges for oxygen and other gases and anesthetics and their administration

23   • Charges made by a licensed extended care facility upon direct transfer from an acute care hospital

24   • Emergency local ambulance transport in connection with injury or sickness resulting in inpatient hospitalization

25   • Expenses related to complications of pregnancy

26   • Charges for physical therapy that is prescribed in advance by a physician in relation to a covered injury or sickness

27

[9] Available at www.hccmis.com/downloads, under the tab "Brochures," subtab "STM Complete,"

28   and subtab "CA."

1    *Id*. at 3.

2          44.    In the Brochure, HCC further addresses the issue of "eligibility" by, *inter alia*,

3    representing that an applicant is "eligible" if she answers "no" to medical questions on the

4    application form:

5          **HCC Life STM Eligibility****
           You are eligible to apply for HCC Life STM if you are age 2
6          through 64 and you meet the following requirements:
           1. You are not pregnant, an expectant father, or planning
7          on adopting.
           2. You will not be covered by other medical insurance at
8          time of requested effective date.
           3. You are not a member of the armed forces of any
9          country, state, or international organization, other than
           on reserve duty for 30 days or less; and
10         4. You are able to answer "no" to the medical questions on
           the application form.
11

12    *Id*. at 4.

13          45.    That fourth criterion, when read in conjunction with the Application Form,[10]

14    would lead a consumer to believe that as long as she answered "no" to an (ostensibly) exhaustive

15    list of conditions on the application form, her claims would otherwise be covered.  The

16    Application Form's "medical question" section reads, in pertinent part:

17              1.  Will you have other health insurance in force on the policy
                    effective date or be eligible for Medicaid?
18

19              2.  Have you:

20                  a.  Been denied insurance due to any health reasons for
                        a condition that is still present?
21

22                  b.  Now pregnant, in process of adoption or undergoing
                        infertility treatment?
23
                    c.  Over 300 pounds if male or over 250 pounds if
24                      female?

25              3.  Within the last 5 years have you been diagnosed, treated, or
                    taken medication for any of the following: cancer or tumor,
26                  stroke, heart disease including heart attack, chest pain or

27    ───────────────
      [10] As with the Brochure, HCC's website leaves the impression that there is a single application
28    form for California.  Available at www.hccmis.com/downloads, under the tab "How to Apply,"
      subtab "STM Complete," and subtab "CA."

1333194.11

had heart surgery, COPD (chronic obstructive pulmonary disease) or emphysema, Crohn's disease, liver disorder, degenerative disc disease or herniation/bulge, rheumatoid arthritis, kidney disorder, diabetes, degenerative joint disease of the knee, alcohol abuse or chemical dependency, or any neurological disorder?

4. Within the last 5 years have you been diagnosed or treated by a physician or medical practitioner for Acquired Immune Deficiency Syndrome (AIDS)?

5. If you are not a US Citizen, do you expect to legally reside in the US for the duration of the policy?

Application Form at 1.

46.     When read in conjunction with the language of the Brochure—particularly the "eligibility" language—an applicant would reasonably conclude that any exclusions of coverage would be cabined to the subject matter of questions 2-4, above, *i.e.*, the universe of exclusions would pertain to:

- Any present condition for which the applicant was previously denied health insurance (2.a)
- Pregnancy (2.b)
- Obesity (2.c)
- cancer or tumor (3)
- stroke, heart disease including heart attack, chest pain or heart surgery (3)
- COPD (chronic obstructive pulmonary disease) or emphysema (3)
- Crohn's disease (3)
- liver disorder (3)
- degenerative disc disease or herniation/bulge (3)
- rheumatoid arthritis (3)
- kidney disorder (3)
- diabetes (3)
- degenerative joint disease of the knee (3)
- alcohol abuse or chemical dependency (3)
- neurological disorder (3)
- diagnosis or treatment for AIDS (4)

47.     Further, on page two of the Application Form, under the "Authorization" section, the following statements, *inter alia*, are made: "I understand this insurance contains a Pre-existing Condition exclusion, a Pre-certification Penalty and other restrictions and exclusions. . . . *I*

1333194.11

1   ***understand that the information contained herein is a summary of the coverage offered in the***

2   ***Certificate of Insurance*** and that I may obtain a complete copy of the Certificate of Insurance

3   upon request to HCC Life."

4       48.    Additionally, this same "Authorization" section of the Application Form makes the

5   representation that any Producer or HCC employee assisting with the application is an agent of

6   the applicant, rather than of the insurer.  It states that the applicant

7   
8           understand[s] and agree[s] that the insurance agent/broker, if any, assisting with this application is a representative of the Applicant. If signed by a representative of the Applicant, the undersigned represents his/her capacity to so act. If signed as guardian or proxy of the Applicant, the undersigned represents his/her capacity to so act. By acceptance of coverage and/or submission of any claim for benefits, the Applicant ratifies the authority of the signer to so act and bind the Applicant.

9   
10  
11  

12  *Id*.  HCC's representation that "the insurance agent/broker, if any, assisting with this application

13  is a representative of the Applicant" is not an accurate statement of the law, and is an attempt by

14  HCC to insulate the unlawful and unfair acts of it and its agents from private challenge.  This

15  purported special and/or agency relationship created between HCC's representative and the

16  applicant makes the misrepresentations and omissions in the application process all the more

17  actionable and fraudulent.

18      49.    When read together, each of HCC's customer-facing representations (the Brochure

19  and the Application Form) limit exclusions to those enumerated above, or at minimum are so

20  divorced from the exclusion language in the actual policy—as well as HCC's claims denial

21  practices—to amount to fraud insofar as Defendants do not acknowledge that these are limited

22  examples, and enforce (and misuse) a much broader list of exclusions.

23      50.    Upon information and belief, Defendants knowingly worked with unqualified and

24  unlicensed brokers who used common unscrupulous and dishonest tactics to sell policies.

25      51.    For example, and underscoring the systematic nature of the practices, Defendant

26  HII has received cease and desist letters from, at least, the states of Michigan (on May 1, 2014),

27  Arkansas (on March 28, 2016), and Montana (on May 9, 2016).  All of these letters noted that HII

28  

CLASS ACTION COMPLAINT
CASE No. 3:17-CV-618

1333194.11

was selling short-term insurance plans through unlicensed brokers and/or through misinformation and deception.

52.     A Notice of Proposed Agency Action issued to HII on May 9 by the Montana Commissioner of Securities and Insurance detailed how unlicensed Producers worked with HII to sell HCC health insurance policies to unsuspecting Montana consumers.  For example, single licensed Producers would work in concert with unlicensed Producers to sell more policies.

53.     Before purchasing policies, potential policyholders are deceived and misled by Producers as to the nature and characteristics of the policies based on common omissions and representations.

54.     Defendants and Producers employ the following devices, among others, to intentionally induce policyholders to pay for policies without reading them and without understanding the limitations of their coverage: (i) Producers issue policies without requiring policyholders to sign the policies; (ii) Producers represent to prospective policyholders that the policies will meet their needs, and fail to disclose that Defendants routinely attempt to deny most claims on the basis of pre-existing conditions or other grounds; (iii) Defendants make the policies difficult to locate on the HCC website, thereby preventing current and potential policyholders from conducting any meaningful review of their policies; and (iv) Defendants use intentionally vague language, as to further hinder any efforts by policyholders to understand the scope of their coverage; for example, neither the plan brochures nor application forms explain the scope of the policies' exclusion for pre-existing conditions.

55.     HII describes itself as a "partner" of HCC in a July, 3, 2013 press release announcing the relationship.[11]

56.     Defendants also maintain a common policy of communicating to policyholders that treatments are covered, when Defendants know that such treatments are either not covered or that Defendants will attempt to deny payment for them.  For example, when Plaintiffs needed medical treatment, they called Defendants' customer service representatives to ensure they were

---

[11] *See* http://investor.hiiquote.com/releasedetail.cfm?ReleaseID=775244 (last visited 1/10/2017).

covered for the treatment in question, and were told that they were covered.  Thereafter,
Defendants proceeded to deny them the coverage to which Plaintiffs were entitled.

57.     Finally, in yet another effort to insulate their unlawful and unfair conduct from the
full reach of the law, Defendants work with CBA in providing short-term insurance plans to
consumers.  HCC's application form instructs the applicant that the insurance sought is "issued to
the Consumer Benefits of America Association and underwritten by HCC Life Insurance
Company."  This is because HCC wishes to sell its insurance product as a group product, instead
of an individual product subject to more stringent consumer protection regulation.  CBA charges
dues of $12 a month, and has no meaningful membership restrictions.

**C.      Defendants' Customer Service Representatives Are Trained to Compound the
Company's Unfair and Unlawful Denial or Delay of Claims.**

58.     Once an insured has been alerted that her claim is either denied due to a pre-
existing condition or that the claim is otherwise deficient, she is instructed to call an HCC help
center for more information.  However, HCC trains its customer service representatives to
deceive or otherwise obstruct policyholders attempting to resolve their disputes.

59.     Upon information and belief, the majority of (if not all) customer service calls to
HCC are transferred to Global Response ("Global"), a third-party contractor whose employees are
trained by HCC to handle their customer service.[12]

60.     HCC trains and instructs the customer service representatives at Global (called
"Brand Care Specialists") to interact with customers in a manner likely to deceive, delay, and
obstruct policyholders attempting to resolve their disputes.

61.     HCC employs customer service and claims processing policies and procedures that
are calculated to obstruct and frustrate the efforts of policyholders to obtain payment of their
claims.  For example, and without limitation, Brand Care Specialists are given extremely short,
inadequate training before they begin taking calls from policyholders.

---

[12]   The precise nature of Defendant HII's relationship with Global is unknown to Plaintiffs and
must be revealed through discovery.

1333194.11

62.     Brand Care Specialists are forced by Defendants to use a script provided by HCC that walks them through improper denial and obstruction of claims.  The script is designed to discourage policyholders from seeking payment on their claims or from successfully providing sufficient information to process existing claims.  Instead of helping resolve disputes, Brand Care Specialists are instructed by HCC to tell policyholders that their claims relate to pre-existing conditions, and to discourage them by emphasizing the expansive scope of the policies' pre-existing condition exclusions, without determining whether the claim is likely to be excluded.

63.     A disillusioned Brand Care Specialist explained the process in greater detail on a public consumer protection forum:[13]

> As a "Brand Care Specialist" we were trained to work in HCC's systems and handle their calls but there was almost no support from the company HCC or Global. Not only did we take the most heart breaking calls from customers but also from hospitals and debit collectors looking to get information on claims to pursue the customer. . . .  [P]erhaps most tragically if we wanted to help someone out the only real options were to post to an internal Microsoft SharePoint website and hope that someone took it to HCC or to pass it to another team member acting as manager to have an email sent to the same place that yours would go. The only way anything went somewhere was if the caller mentioned a lawsuit and at that point it was passed to the HCC legal team and we were instructed to end the call. I want to emphasize here that we had no way to contact HCC directly, or to interact with them (I'm guessing by design) so we had no way to ever get your issues addressed beyond what you could find out for yourself.
>
> . . .
>
> The only [Brand Care Specialists] that can take it are the ones that can just parrot out the party line "Did you read your policy?", "Did you check the website?", "Did you send in the forms?" and basically convince themselves that it's always the customers fault. That's right it's your fault for not taking a day or so and doing a through [sic] investigation on the company, you had/have no expectation of not being screwed.
>
> . . . Even trying to help out a customer by using non-legal terms or walking them through the disheartening process of claims was cause for a "Coaching", that is management talk for a dressing down but not on the record. So even the ability to explain things to you in terms you'd understand was tightly controlled.
>
> It basically comes down to this; When you call in the people that

---

[13]   "HCCMIS – A View from the Inside," *available at* https://hccmis.pissedconsumer.com/a-view-from-the-inside-20160424835550.html.

CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-618

are on the other line have no power, ZERO authority or means to help you out beyond what you can do for yourself on the websites. In my bosses words "We're just telling them what is on the website and what they can find out for themselves".

64.     Policyholders frustrated or confused by Brand Care Specialists' misleading, deceptive and obstructionist tactics have no recourse, because, as discussed above, Brand Care Specialists are not empowered to transfer policyholder calls to HCC.

65.     Brand Care Specialists are instructed to, and do, proactively and aggressively refer callers to the HCC website instead of helping them.  For example, and without limitation, Brand Care Specialists do not send policyholders copies of their policies when requested.  Instead, they refer policyholders to the HCC website, where policyholders must attempt to locate an accurate version of their policy amidst a confusing array of options and menus.

66.     The HCC website is unreasonably difficult to navigate for a reasonable consumer, highly confusing, and frequently out of service.

67.     Brand Care Specialists are further instructed by HCC to deceive policyholders who ask to appeal a denial of a claim, by telling such policyholders that the matter has been escalated, without actually escalating the matter until 60 days after the appeal is requested.  HCC, through its representatives at Global, thus makes false statements to policyholders in order to induce them to stop seeking payment.  As the same individual stated on the consumer protection forum:[14]

Even internally it was obvious that the name of the game is runaround. . . . [T]here was never any clarity as to what we were supposed to do to help people navigate the bureaucracy. It really felt like everything was designed to be so cumbersome that the customer would either get frustrated and give up or they could stall long enough to not have to pay out on the claim. I even think the idea was to get us so frustrated that we'd blow the customers off or just tell them we had received documents just to get them to go away. The whole idea here is that we're a legal buffer between HCC and you as was made crystal clear in training when they said outright that we'd be thrown under the bus if we ever deviated from the script; that HCC and Global Response would not protect us if legal action was directed at the company. Basically we'd be the bumper.

---

[14]   *See supra* n.13.

CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-618

68.     Brand Care Specialists who question or resist the deceptive and fraudulent practices demanded by HCC are disciplined, pressured to quit their jobs, or fired, because HCC has made clear that Global will lose HCC's business unless it carries out the unethical and unlawful policies and procedures described throughout this complaint.

69.     HCC represents that claims under its health insurance policies will be resolved within 45 days.  However, HCC's procedures make this promise difficult or impossible to keep, because its process of gathering and reviewing medical records is extremely inefficient and time-consuming.

70.     Defendants or their customer service agents routinely, and as a matter of policy, ask for additional information from insureds during the claims process, including by instructing insureds to locate their own policies, even when Defendants routinely fail to send Class Members their policies, or explained to Class Members how to access their policies on the internet. Defendants subsequently deny coverage when insureds are unable to obtain the information, or are late in doing so.

71.     Global employees have reported myriad complaints to HCC.  HCC accordingly knew and knows, among other things, that there is widespread and intense customer dissatisfaction with its services, that customers are being misled as to the extent and nature of their coverage, and that attempts to secure payment from HCC are being denied and obstructed in bad faith.

72.     HCC and/or HII are vicariously or directly liable for any violations constituted by the policies and procedures of Global, because, without exclusion, it directs the conduct of its agents at Global and elsewhere, it has designed the procedures and policies carried out by its agents at Global and elsewhere, and it maintains its own website and claims systems.

**D.     Complaints About HCC**

73.     Plaintiffs' experiences are typical examples of the experiences of myriad other victims.  Publicly-available sources are replete with reviews where consumers complain of the identical sales, service, and claims processing issues concerning HCC's policies that are at issue here.  A small sample appears below ([sic] throughout):

- 17 -

a.   "S.L."[15]

Horrible, bad, disgusting, irresponsible Insurance. I bought the short term Medical insurance for my husband on January 2015 while we were waiting for a long term insurance's confirmation. HCC approved my husband and me quickly because we had no major healthy issues in the past our record is clear. We paid our premium and officially under coverage. Unfortunately and unexpectedly, my husband had more heart attack and almost die. He was in the hospital for more than a month. For the next few months, I tried very hard to have HCC pay for our bills but they kept giving us hard time. With a husband who almost die and care for, I ran out of energy. I didn't even have energy to file a complain until now. The total amount HCC paid was $212.40.

b.   "Rick"[16]

It is with deep regret that I ever chose HCC health insurance. This was a mistake that has completely turned my life upside down. When I applied for this health coverage through my local insurance agent, I was led to believe that this coverage was good short term insurance and met the minimum Obama Affordable Care Act requirements. Recently I found out that this is not true. When I applied for this insurance I believed that I qualified for this coverage. Now after having a major heart attack in December and bills totaling about $66,000 I have been denied any coverage due to a doctor's note about 4 years ago stating that I have a degenerative disc in my lower back. I was told by my doctor that my discs were showing NORMAL wear from aging. He said that all adults have some form of this. My doctor did NOT call this a Disease. Degenerative disc is not a DISEASE - it is a NORMAL part of aging. When someone applies for coverage through this company it should be required to produce 5 years of medical records at that time so it is clear that patients are eligible for coverage. It is clear that they are more concerned about collecting premiums than doing the right thing. It seems maybe I would have been better off if I had not survived my heart attack. DO NOT EVEN CONSIDER THIS INSURANCE!

c.   "Ann D." from Washington[17]

I would NEVER, EVER suggest that anyone purchase insurance from HCC. I have been fighting with them for nearly 10 months to pay medical claims. Bills are now being sent to collections because of HCC excuses such as, "We need more records", "We

---

[15]   Complaint posted at https://www.bbb.org/indy/business-reviews/insurance-health/hcc-medical-insurance-services-llc-in-indianapolis-in-90005439/reviews-and-complaints (last visited 1/20/2017).

[16]   Complaint posted at https://www.bbb.org/indy/business-reviews/insurance-health/hcc-medical-insurance-services-llc-in-indianapolis-in-90005439/reviews-and-complaints (last visited 1/20/2017).

[17]   Review posted on Yelp at https://www.yelp.com/biz/hcc-medical-insurance-services-indianapolis (last visited 1/24/2017).

didn't have your correct address".  That's the very short list; other comments were, "We don't have that provider on file" when they had sent a denial notice to the provider.  My favorite (NOT) was when speaking with a representative, I told her I had another question. Her response was, "I just closed your account on the computer, are you telling me you want me to open it again?".  Um, Yes, I am telling you I want you to open the account again.  Sheesh.  I've submitted a complaint to the State Insurance Commission and am considering legal action.  DO NOT use HCC.

### d.     "Golam"[18]

File a claim on 03/21/2016, did not hear them for long time although their email said they will respond within 60 business days. I again contacted on 9/2/2016 and they said they will get back in 30 days which they did not. Now today (1/10/2017) contacted and their initial response was I don't have any claim filed. After a long wait, they could find my previous notes and now claiming I need to send some some extra information which was not listed in their claim form. So basically either they are lying or trying to put me in some of their "fine printing" loophole. I would appreciate their requirement if they send me those after my first claim filing. But they did not respond and each time they are trying to tell me a new story. So basically its a fraudulent company and govt. should close it down ASAP.

### e.     "Erica M." from Texas[19]

Completely outraged with this company.  I was looking for a full medical plan and the person on the phone told me that's what I would be getting and signed me up for a short term plan instead.  I should have read over my policy sooner, however I believe this is an unethical company.  Now I will pay 2% of my income at the end of the year, plus the $175/month I paid to this company.  Didn't even cover my OBGYN.  That goes toward the deductible. I feel defeated and have spent the morning crying :(

## VI.    TOLLING

### A.     Discovery Rule Tolling

74.    Class Members had no way of knowing about the Defendants' practices with respect to the sale of insurance and administration of claims.  Defendants delayed and thus tried to hide the true facts that they had no intention of paying claims.

---

[18]   Complaint posted at https://www.bbb.org/indy/business-reviews/insurance-health/hcc-medical-insurance-services-llc-in-indianapolis-in-90005439/reviews-and-complaints (last visited 1/20/2017).
[19]   Review posted on Yelp at https://www.yelp.com/biz/hcc-medical-insurance-services-indianapolis (last visited 1/24/2017).

1333194.11

75.     Within the period of any applicable statutes of limitation, Plaintiffs and the other Class Members could not have discovered through the exercise of reasonable diligence that Defendants were hiding their true practices.

76.     All applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.     Fraudulent Concealment Tolling**

77.     All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

78.     Instead of disclosing its true practices, Defendants falsely represented that was a reputable insurance company that paid claims.

**C.     Estoppel**

79.     Defendants were under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of their insurance scam.

80.     Defendants knowingly, affirmatively, and actively concealed the true facts from policyholders.

81.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**VII.     CLASS ACTION ALLEGATIONS**

82.     This action is brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs bring this action on behalf of themselves and others similarly situated.  The proposed Class is defined as:

> All individuals who have purchased HCC health insurance policies from Defendants in the State of California, and/or all California residents for whom  HCC denied their insurance claim, since a date to be ascertained through discovery.

> Excluded from the Class are Defendants, any entity in which Defendants has or had a controlling interest or which has or had a controlling interest of any Defendants, and Defendants' legal representatives, assigns and successors.  Also excluded are the judge to whom this case is assigned and any member of the judge's

1333194.11

immediate family.

83.     Plaintiffs reserve the right to amend or modify the Class definition in connection with a motion for class certification or as warranted by discovery.

84.     <u>Numerosity</u>:  Plaintiffs do not know the exact size or identities of the proposed Class, however, Plaintiffs believe that the Class encompasses thousands of individuals who are dispersed geographically throughout California.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.  The Class is ascertainable by Defendants' records, and Class Members may be notified of the pendency of this action by mail and/or electronic mail, supplemented if deemed necessary or appropriate by the Court by published notice.

85.     <u>Existence and Predominance of Common Questions of Fact and Law</u>: There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class.  The damages sustained by Plaintiffs and the Class Members flow from the common nucleus of operative facts surrounding Defendants' misconduct.  The common questions include, but are not limited to the following:

   a. whether Defendants' conduct constituted a breach of Cal. Bus. & Prof. Code §§ 17200 and 17500, *et seq*.;

   b. whether Defendants or their agents pursued uniform policies and procedures in their policy sales, customer service, or claims processing;

   c. whether those policies and procedures codified or effected systematic misrepresentations, breaches of contract, or other illegalities;

   d. whether Defendants knew of or directed the unlawful conduct of their agents or affiliates;

   e. whether Defendants failed to comply with the terms of their health insurance policies;

   f. whether a reasonable consumer would consider Defendants' misrepresentations material in purchasing Defendants' health insurance policies;

1333194.11

g.    whether, as a result of Defendants' omissions and/or misrepresentations of material facts, Plaintiffs and Class Members have suffered a loss of monies and/or property and/or value; and

h.    whether Plaintiffs and Class Members are entitled to monetary damages and/or other remedies and, if so, the nature of any such relief.

86.    <u>Typicality</u>:  Plaintiffs' claims are typical of the Class' claims, because Plaintiffs and the Class sustained damages arising out of Defendants' wrongful conduct in violation of California law, and because Plaintiffs and the other members of the Class have an interest in preventing Defendants from engaging in such activity in the future.

87.    <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in class and consumer litigation and have no conflict of interest with other Class Members in the maintenance of this class action. Plaintiffs have no relationship with Defendants except as policyholders who entered contracts with Defendants.  Plaintiffs will vigorously pursue the claims of the Class.

88.    <u>Superiority</u>:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class Members to individually seek redress for the wrongs done to them.  Plaintiffs believe that Class Members, to the extent they are aware of their rights against Defendants herein, would be unable to secure counsel to litigate their claims on an individual basis because of the relatively small nature of the individual damages, and that a class action is the only feasible means of recovery for the Class Members.  Individual actions also would present a substantial risk of inconsistent decisions, even though each Class Member has an identical or substantially similar claim of right against Defendants.  Plaintiffs envision no difficulty in the management of this action as a class action.

89.    In the alternative, the Class may be certified because:

1333194.11

CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-618

a.   the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members which would establish incompatible standards of conduct for Defendants;

b.   the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of the other Class Members not parties to the adjudications, or substantially impair or impede the ability to protect their interests; and Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")
CAL. BUS. & PROF. CODE § 17200,** *et seq.*

90.   Plaintiffs repeat and re-allege each of the allegations above and below as if fully set forth here.

91.   Defendants' conduct in selling its health insurance policies was an unfair, unlawful, and/or fraudulent business practice in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

92.   The conduct described throughout this complaint took place in the State of California and harmed California consumers.

93.   Defendants' conduct violates California Insurance Code § 332 because Defendants failed to communicate, in bad faith, material facts within their knowledge that Plaintiffs had no means of ascertaining.  These facts include, but are not limited to:  the scope of Defendants' pre-existing condition exclusions; that Defendants' insurance policies did *not* include comprehensive coverage, fair claims processes, or honest customer service; and that Defendants in fact train

1  customer service representatives to deceive or otherwise obstruct policyholders who attempt to

2  resolve their claims disputes.

3       94.    Defendants' violation of California Insurance Code § 332 constitutes a predicate

4  unlawful act for the purposes of the UCL's unlawful prong.

5       95.    Defendants' conduct is also unfair and fraudulent, in violation of the UCL's unfair

6  and fraudulent prongs.  The unfairness and fraudulence of Defendants' conduct does not depend

7  on whether that conduct is separately unlawful.  Furthermore, Defendants' unlawful acts are not

8  identical to the acts forming the corpus of Defendants' unfair and fraudulent conduct.

9       96.    Defendants' conduct is fraudulent because Defendants train or instruct insurance

10  brokers and customer service representatives acting on behalf of Defendants to make false and

11  misleading statements to California consumers (and to omit disclosure of material facts), as

12  detailed more fully throughout this complaint.

13       97.    Defendants' practices are likely to deceive the public.  A reasonable consumer

14  would be deceived by Defendants' statements and omissions in the selling of HCC health

15  insurance policies, and Plaintiffs and members of the Class have in fact been deceived.

16       98.    Defendants' practices are unfair, unscrupulous, and injurious to consumers.  They

17  are contrary to the public policy of the State of California, as codified in Cal. Ins. Code § 330 *et*

18  *seq.*, Cal. Insurance Code § 10198.7, and Cal. Ins. Code § 790 *et seq.*, as well as of the United

19  States, as codified in the Affordable Care Act.

20       99.    Defendants' practices are unfair, and injurious to competition, because they allow

21  Defendants to undercut competitors' prices, and create an incentive for competitors to pursue

22  similarly unscrupulous and deceptive tactics.  The harm to consumers outweighs any utility of

23  Defendants' acts.  When they purchased their policies, Plaintiffs relied on the deceptive

24  statements of Defendants as described in this complaint.

25       100.   Plaintiffs have standing to pursue claims under the UCL because money or

26  property was lost as a result of Defendants' unlawful, unfair, and fraudulent business practices.

27  For instance, as alleged herein, Plaintiffs paid money for their premiums and received an

28  unlawful and effectively worthless insurance policy in return; in the alternative, Plaintiffs paid

- 24 -

1  more for the insurance policies than they would have had the true nature of the policies been

2  disclosed.

3         101.   Further, Plaintiffs who had claims denied suffered additional injuries in the form

4  of out-of-pocket medical costs incurred due to Defendant's acts.

5         102.   As a direct and proximate result of Defendants' unfair, unlawful, and/or fraudulent

6  business practices as set forth above, Defendants have been unjustly enriched by Plaintiffs' and

7  the Class' payment of consideration in the purchase of their insurance policies.  As such,

8  Plaintiffs and the Class are entitled to restitution of all consideration paid to Defendants under the

9  UCL.

10        103.   Further, Plaintiffs are entitled to an order (i) enjoining the practices complained of

11  herein, and (ii) ordering Defendants to establish a common fund for the payment of medical

12  expenses incurred by Plaintiffs and the Class as a result of Defendants' practices.

13                                    **<u>COUNT II</u>**

14  **VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW ("FAL")**
    **CAL. BUS. & PROF. CODE § 17500,** *et seq.*

15

16        104.   Plaintiffs re-allege and incorporate by reference each of the allegations above and

17  below, as if fully set forth here.

18        105.   The conduct described throughout this Complaint took place in the State of

19  California and harmed California consumers, and constitutes deceptive or false advertising in

20  violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500.

21        106.   The FAL applies to all claims of all Class Members because the alleged conduct

22  occurred within the State of California.

23        107.   The FAL prohibits deceptive or misleading practices in connection with

24  advertising or representations made for the purpose of inducing, or which are likely to induce,

25  consumers to purchase products including insurance policies.

26        108.   Defendants, when they marketed, advertised and sold health insurance policies to

27  Plaintiffs and Class Members, falsely represented to Plaintiffs and Class Members that their

28

1333194.11

insurance policies included comprehensive coverage, fair claims processes, honest customer service, and other features and characteristics that the policies do not include.

109.   At the time of its misrepresentations, Defendants were either aware that their statements were untrue or that Defendants lacked the information and/or knowledge required to make such representations truthfully.

110.   Defendants' descriptions of their insurance policies, claims processes, and customer service practices were false, misleading, and likely to deceive Plaintiffs and other reasonable consumers.  Defendants' conduct therefore constitutes deceptive or misleading advertising.

111.   Plaintiffs have standing to pursue claims under the FAL because they reviewed and relied upon Defendants' written and oral statements.

112.   In reliance on the statements made in Defendants' advertising, marketing, or sales, which were ultimately untrue, Plaintiffs purchased Defendants' health insurance policies.

113.   Had Defendants' representations regarding their health insurance policies, claims processes, and customer service disclosed their true nature, Plaintiffs and Class Members would not have purchased them.

114.   Defendants' statements in their advertising, marketing, and sales, referenced herein, were part of a scheme or plan by Defendants to sell insurance policies they knew to be inferior to the policies they advertised and promised.

115.   As a direct and proximate result of Defendants' violations of the FAL, Plaintiffs and the Class seek restitution of any monies wrongfully acquired or retained by Defendants by means of their deceptive or misleading representations.

116.   Further, Plaintiffs are entitled to an order (i) enjoining the practices complained of herein, and (ii) ordering Defendants to establish a common fund for the payment of medical expenses incurred by Plaintiffs and the Class as a result of Defendants' practices.

1333194.11

**COUNT III**

**BREACH OF CONTRACT**

117.    Plaintiffs re-allege each of the allegations above and below as if fully set forth here.

118.    The policies that Defendants sold Plaintiffs, combined with the timely payment of premiums amounted to legally enforceable promises and obligations owed via contract.

119.    By accepting the premium payments from Plaintiffs, Defendants agreed to timely process, reasonably investigate, and pay claim amounts for certain medical expenses according to the terms of the policies.

120.    When Defendants failed to perform proper investigations, timely process claims, perform customer service obligations in good faith, and make payments required by the policies, they breached contractual duties owed to Plaintiffs.

121.    By systematically delaying and obstructing Plaintiffs' efforts to—without limitation—submit claims, appeal claims denials, receive information about claims, and receive payment of claims, Defendants breached contractual duties owed to Plaintiffs.

122.    Defendants forced Plaintiffs to perform claims processing functions that were the contractual duties and obligations of Defendants.

123.    Without exclusion, Defendants violated their contractual promise in Part VIII of the Policy, which obligates Defendants to pay covered losses "no later than 30 working days" after receiving a proof of loss.

124.    Without exclusion, Defendants violated their contractual promise in Part VIII of the Policy by denying Plaintiffs and members of the class the right to request independent medical review after Defendants have denied, modified, or delayed claims.

125.    Defendants' breaches caused damage to Plaintiffs including but not limited to: interest and penalties charged by medical facilities on amounts due and outstanding; additional monies paid over and above Plaintiffs' maximum out of pocket under the policies; costs incurred to force Defendants to perform their contractual obligations, make necessary payments, and enforce Plaintiffs' policies; lost time from work as a result of repeated calls to Defendants or

1333194.11

otherwise attempting to track down information related to Plaintiffs' claims; medical treatments foregone or not pursued because of the fear of denial, incurring more debt, and additional harassment from collection or billing personnel at medical facilities; and interest on the claim amounts that were improperly denied.

126.    Plaintiffs and Class Members owe monies to certain medical providers for reasons directly and proximately related to Defendants' denials, and Defendants continue to be in breach of their insurance contracts.

127.    All damages sustained by Plaintiffs and Class Members are the result of Defendants' breach of obligations owed the Plaintiffs and Class Members under the policies they purchased.

## COUNT IV

### BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

128.    Plaintiffs repeat and re-allege each of the above and below allegations as if fully set forth herein.

129.    Without exclusion, Defendants trained their customer service representatives to consciously mislead, obstruct, and delay Plaintiffs seeking payment of claims.  This claims-handing conduct was a matter of company policy and was without proper cause.

130.    Defendants unreasonably denied Plaintiffs coverage for care that was covered under their insurance policies.

131.    Defendants unreasonably denied Plaintiffs coverage before conducting a reasonable investigation of Plaintiffs requests.

132.    Defendants engaged in a pattern and practice of unreasonably failing to give at least as much consideration to its insureds' interests as it gave its own interests, in the investigation and handling of claims.

133.    Defendants unreasonably failed to respond to Plaintiffs' pleas to accept or deny coverage under their policies in a reasonable amount of time.

134.    Defendants unreasonably failed to search for and consider evidence that supported the medical necessity of Plaintiffs' requests for benefits and services under their policies.

1333194.11

135.    Defendants engaged in a pattern and practice of unreasonably failing to diligently search for and consider evidence that supported the medical necessity of the insureds' requests for benefits and services under HCC policies.

136.    Defendants have committed institutional bad faith.  Defendants' institutional bad faith amounts to reprehensible conduct because the conduct is part of a repeated pattern of unfair practices and not an isolated occurrence.  The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in the established company policies of Defendants.

137.    Plaintiffs believe and allege that Defendants have breached their duty of good faith and fair dealing by other acts and omissions, of which Plaintiffs are presently unaware and which will be shown in the course of discovery.

138.    As a direct and proximate result of the conduct of Defendants, the Plaintiffs and the Class Members have suffered, and will continue to suffer in the future, financial and other consequential damages, including personal physical injuries, physical sickness, and physical disability, for a total amount to be shown at the time of trial.

139.    As a further direct and proximate result of the unreasonable conduct of Defendants, Plaintiffs have suffered anxiety, worry, and mental and emotional distress, damaging them in an amount to be determined at trial.

140.    As a further proximate result of the aforementioned conduct of Defendants, Plaintiffs have been compelled to retain legal counsel to obtain the benefits due under the policy. Therefore, Defendants are liable to Plaintiffs for those attorneys' reasonably necessary fees in an amount to be determined at the time of trial.

## COUNT V

## UNJUST ENRICHMENT

141.    Plaintiffs repeat and re-allege each of the allegations above and below as if fully set forth here.

142.    Plaintiffs bring their unjust enrichment claim in the alternative to their claim for restitution under the UCL.

1333194.11

143.   Through their deceptive and unlawful actions, Defendants have received monies from Plaintiffs and the Class Members that they should not have, in the form of higher premiums and greater revenues than they would have enjoyed had they acted lawfully.  In addition, they were spared from spending money they would have otherwise spent that Plaintiffs had to pay out of pocket.

144.   Defendants' retention of the monies gained through their deceptive practices would be unjust.

145.   Defendants should be required to disgorge their unjustly obtained monies and make restitution to Plaintiffs and the Class Members, in an amount to be determined.

146.   By reason of the foregoing, Plaintiffs and the Class Members were damaged in the amount they paid for their insurance policy premiums and/or out of pocket for claims.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of the Class Members, pray for judgment and relief against Defendants as follows:

A.   For an order certifying the case as a class action and appointing Plaintiffs and Plaintiffs' counsel to represent the Class;

B.   For an order awarding, as appropriate, damages to Plaintiffs and the Class Members, including all monetary relief to which Plaintiffs and the Class Members are entitled under California law, in particular under the UCL and FAL;

C.   For an order awarding restitutionary disgorgement to Plaintiffs and the Class;

D.   For an order awarding non-restitutionary disgorgement to Plaintiffs and the Class;

E.   For an order requiring Defendants to immediately cease and desist their unlawful, deceptive, and obstructive practices with respect to the sales, claims processing, and customer service connected with their health insurance policies;

F.   For an order requiring Defendants to establish a common fund for the payment of medical expenses incurred by Plaintiffs and the Class as a result of Defendants' practices;

G.   For an order awarding attorneys' fees and costs;

H.   For an order awarding punitive damages;

I.   For an order awarding pre-judgment and post-judgment interest; and

J.   For an order providing such further relief as the Court deems just and proper.

1333194.11

1

## JURY DEMAND

2     Plaintiffs demand a trial by jury on all issues so triable.

3   Dated: February 7, 2017          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

4             By: _____/s/ Kelly M. Dermody_____

5             Kelly M. Dermody (State Bar No. 171716)
kdermody@lchb.com
6             Michelle A. Lamy (State Bar No. 308174)
mlamy@lchb.com
7             275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
8             (415) 956-1000

9             Rachel Geman
rgeman@lchb.com
10            250 Hudson Street, 8th Floor
New York, NY  10013-1413
11            (212) 355-9500

12            CARNEY BATES & PULLIAM, PLLC
13            Allen Carney
acarney@cbplaw.com
14            David Slade
dslade@cbplaw.com
15            519 W. 7th Street
Little Rock, AR  72201
16            (501) 312-8500

17            CUNEO GILBERT & LADUCA, LLP
18            Michael J. Flannery
mflannery@cuneolaw.com
19            7733 Forsyth Boulevard, Suite 1675
Clayton, MO 63105
20            (314) 226-1015

21            Matthew Prewitt
22            mprewitt@cuneolaw.com
16 Court Street, Suite 1012
23            Brooklyn, NY 11241
(202) 789-3960

24            MEHRI & SKALET
25            Jay Angoff
jay.angoff@findjustice.com
26            1250 Connecticut Avenue, NW, Suite 300
Washington, D.C. 20036
27            (202) 822-5100

28            *Attorneys for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-618