GERARD G. PECHT *(Admitted Pro Hac Vice)*
gerard.pecht@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone:     (713) 651-5151
Facsimile:     (713) 651-5246

M. SCOTT INCERTO *(Admitted Pro Hac Vice)*
scott.incerto@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Boulevard, Suite 1100
Austin, Texas  78701-4255
Telephone:     (512) 474-5201
Facsimile:     (512) 536-4598

JOSHUA D. LICHTMAN (SBN 176143)
joshua.lichtman@nortonrosefulbright.com
MICHELLE L. MELLO (SBN 288081)
michelle.mello@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
555 South Flower Street, Forty-First Floor
Los Angeles, California  90071
Telephone:     (213) 892-9200
Facsimile:     (213) 892-9494

Attorneys for Defendants
HCC LIFE INSURANCE COMPANY and HCC
MEDICAL INSURANCE SERVICES, LLC
(*erroneously sued as* TOKIO MARINE HCC –
MEDICAL INSURANCE SERVICES GROUP)

## IN THE UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

|  |  |
|---|---|
| MOHAMMED AZAD and DANIELLE BUCKLEY, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TOKIO MARINE HCC – MEDICAL INSURANCE SERVICES GROUP, HEALTH INSURANCE INNOVATIONS, INC., HCC LIFE INSURANCE COMPANY, and CONSUMER BENEFITS OF AMERICA, <br><br> Defendants. | Case No.:  4:17-cv-00618-PJH <br><br> **HCC LIFE INSURANCE COMPANY AND HCC MEDICAL INSURANCE SERVICES, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> **[FED.R.CIV.P. 12(B)(6)]** <br><br> Date:   May 24, 2017 <br> Time:   9:00 a.m. <br> Ctrm :  3 <br><br> Complaint Filed:  February 7, 2017 |

DOCUMENT PREPARED
ON RECYCLED PAPER

Case No.:  4:17-cv-00618-PJH
HCC LIFE INSURANCE COMPANY AND HCC MEDICAL INSURANCE SERVICES, LLC'S
NOTICE OF MOTION AND MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ............................................................ 1

ISSUES TO BE DECIDED ................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT .................................. 2

    I.    Summary of Plaintiffs' Claims and Factual Allegations ........................................ 3

        A.    Plaintiffs' theory that the preexisting conditions exclusion was misrepresented is belied by the Complaint and materials incorporated by reference therein ............................................................... 4

            1.    Additional details of Azad's purchase demonstrate he was not misled ........................................................................................ 7

            2.    Buckley alleges no facts to indicate her husband was misled ......... 8

        B.    Plaintiffs' unfair claims handling practices theory ..................................... 8

ARGUMENT AND AUTHORITIES ...................................................................................... 9

    II.    Standard of Decision for Motion to Dismiss ........................................................ 9

    III.    Plaintiffs' 1st Count Fails to State a Claim Under any Prong of the UCL ........... 11

        A.    Plaintiffs' UCL "fraud" claim fails ........................................................... 11

            1.    Substantive standards for pleading UCL fraud claims .................. 11

            2.    Plaintiffs fail to meet the Rule 9(b) pleading requirements ........... 12

            3.    Plaintiffs' UCL fraud claim fails because no reasonable consumer could have been misled as to the preexisting conditions exclusion ................................................................. 12

            4.    Plaintiffs fail to allege facts showing they actually and reasonably relied on misrepresentations as to the preexisting conditions exclusion ................................................................. 17

        B.    Plaintiffs' UCL "unlawful" prong claim fails ........................................... 19

        C.    Plaintiffs' UCL "unfair" claim is based on the same alleged misconduct asserted in the fraudulent and unlawful claims and fails for the same reasons ................................................................................... 21

    IV.    Plaintiffs' 2nd Count for False Advertising Fails to State a Claim ..................... 21

    V.    Plaintiffs' 3rd Count for Breach of Contract Fails .............................................. 21

DOCUMENT PREPARED
ON RECYCLED PAPER

**<u>TABLE OF CONTENTS</u>**
(continued)

**Page**

|  |  |
|---|---|
| A. | Plaintiffs fail to allege facts sufficient to constitute breach of contract ................................................................................................... 21 |
| B. | Buckley alleges no cognizable damage resulting from the alleged breach ...................................................................................................... 23 |

VI.   Plaintiffs' 4th Count for Bad Faith Fails Because They Have Not Alleged Facts Showing that their Claims Were Unreasonably Investigated or Denied ..... 23

VII.   The 5th Count Fails Because "Unjust Enrichment" Is not an Independent Claim and, in any Event, Is Duplicative of Plaintiffs' Other Claims.................... 25

CONCLUSION .................................................................................................................... 25

DOCUMENT PREPARED ON RECYCLED PAPER

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,

5
  802 F. Supp. 2d 1070 (N.D. Cal. 2011) ...................................................25

6

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009) ....................................................15

7

8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007) ....................................................10

9

10

*Blankenheim v. E.F. Hutton & Co.*,
  217 Cal. App. 3d 1463, (1990)................................................................18

11

*Bramalea Cal., Inc. v. Reliable Interiors, Inc.*,
  119 Cal. App. 4th 468 (2004)..................................................................23

12

13

*Branch v. Tunnel*,
  14 F.3d 449 (9th Cir. 1994).....................................................................10

14

15

*Broberg v. Guardian Life Ins. Co. of Am.*,
  171 Cal. App. 4th 912, (2009)................................................................18

16

*Brown v. Wells Fargo Bank, NA*,
  168 Cal. App. 4th 938, (2008).................................................................19

17

18

*Cheviot Vista Homeowners Ass'n v. State Farm Fire & Cas. Co.*,
  143 Cal. App. 4th 1486 (2006)................................................................23

19

20

*Davidson v. Kimberly-Clark Corp.*,
  2014 U.S. Dist. LEXIS 110055 (N.D. Cal. Aug. 8, 2014).......................17

21

*Davis v. HSBC Bank Nevada, N.A.*,
  691 F.3d 1152 (9th Cir. 2012)..................................10, 11, 15, 16, 17, 18, 21

22

23

*Ford v. Hotwire*,
  2008 U.S. Dist. LEXIS 108584, 2008 WL 5874305 (S.D. Cal. Feb. 25, 2008) ......................16

24

25

*Hadland v. NN Investors Life Ins. Co.*,
  24 Cal. App. 4th 1578, (1994).................................................................15

26

*Hibu Inc. v. Lawrence*,
  2013 U.S. Dist. LEXIS 173324, 2013 WL 6190538 (C.D. Cal. Nov. 25, 2013)....................21

27

28

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009)................................................................12

Document Prepared
on Recycled Paper

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Cases**

*Kendall v. VISA USA, Inc.*,
  518 F.3d 1042 (9th Cir. 2008)....................................................................................................10

*Keshish v. Allstate Ins. Co.*,
  959 F. Supp. 2d 1226 (C.D. Cal. 2013)....................................................................................23

*Keveney v. Mo. Military Academy*,
  304 S.W.3d 98 (Mo. Banc 2010) ..............................................................................................23

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005)....................................................................................................10

*Love v. Fire Ins. Exch.*,
  221 Cal. App. 3d 1136, 271 Cal. Rptr. 246 (1990) ..................................................................23

*McBride v. Boughton*,
  123 Cal.App.4th 379, (2004)......................................................................................................25

*McColgan v. Mut. of Omaha Ins. Co.*,
  4 F.Supp. 3d 1228, (E.D. Cal. 2014).................................................................................15, 18

*Mony Life Ins. Co. v. Marzocchi*,
  857 F. Supp. 2d 993 (E.D. Cal. 2012) ......................................................................................23

*Overcast v. Billings Mutual Ins. Co.*,
  11 S.W.3d 62 (Mo. Banc 2000) ................................................................................................23

*Park v. Morgan Stanley & Co.*,
  2012 U.S. Dist. LEXIS 22069, 2012 WL 589653 (C.D. Cal. Feb. 22, 2012).........................21

*Pellerin v. Honeywell Int'l, Inc.*,
  877 F. Supp. 2d 983 (S.D. Cal. 2012) ......................................................................................19

*Pirozzi v. Apple Inc.*,
  913 F. Supp. 2d 840 (N.D. Cal. 2012) ......................................................................................12

*Puentes v. Wells Fargo Home Mortg., Inc.*,
  160 Cal. App. 4th 638, (2008)....................................................................................................11

*Samet v. Procter & Gamble Co.*,
  2013 U.S. Dist. LEXIS 86432, 2013 WL 3124647 (N.D. Cal. June 18, 2013) .......................25

DOCUMENT PREPARED
ON RECYCLED PAPER

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Cases**

*Shersher v. Sup. Ct,*
   154 Cal. App. 4th 1491 (2007)............................................................................25

*Sierzega v. Country Preferred Insurance Company,*
   650 Fed. Appx. 388 (9th Cir. 2016)...................................................................24

*Spreewell v. Golden State Warriors,*
   266 F.3d 979 (9th Cir. 2001)..............................................................................10

*Swartz v. KPMG LLP,*
   476 F.3d 756 (9th Cir. 2007)..............................................................................12

*In re Tobacco II Cases,*
   46 Cal. 4th 298, (2009)................................................................................12, 17

*U.S. v. Ritchie,*
   342 F.3d 903 (9th Cir. 2003)..............................................................................10

*United States v. Safran Grp., S.A.,*
   2017 U.S. Dist. LEXIS 8408, 2017 WL 235197 (N.D. Cal. Jan. 19, 2017) ............................10

*Washington v. Baenziger,*
   673 F. Supp. 1478 (N.D. Cal. 1987) ..................................................................12

**Rules and Statutes**

42 U.S.C. § 300gg–91 ............................................................................................3

Cal. Bus & Prof. Code § 17200 .........................................3, 4, 8, 10, 11, 12, 15, 16, 17, 19, 21, 25

Cal. Bus. & Prof. Code § 17500 ........................................3, 4, 8, 10, 16, 21, 25

Cal. Ins. Code § 56.10(c)(2)..................................................................................22

Cal. Ins. Code § 332 ..............................................................................................19

Cal. Ins. Code § 10123.13 ..............................................................................20, 22

Cal. Health & Safety Code § 123100.............................................................20, 21, 24

Fed. R. Civ. P. 8(a)(2) .............................................................................................1

Fed. R. Civ. P. 9(b) ........................................................................................11, 12

DOCUMENT PREPARED
ON RECYCLED PAPER

1

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Cases**

Fed. R. Civ. P. 12(b)(6).............................................................................................1, 9, 10, 25

R.S.Mo. § 375.420 .............................................................................................................23

R.S. Mo. §§ 407.020- 407.100 .........................................................................................11

DOCUMENT PREPARED
ON RECYCLED PAPER

HCC LIFE INSURANCE COMPANY AND HCC MEDICAL INSURANCE SERVICES, LLC'S
NOTICE OF MOTION AND MOTION TO DISMISS

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on May 24, 2017 at 9:00 a.m., before the Honorable Phyllis J. Hamilton, United States District Judge, in Courtroom 3 at the United States District Court, Northern District of California, Oakland Courthouse, 1301 Clay St, Oakland, CA, Defendants HCC Life Insurance Company and HCC Medical Insurance Services, LLC (*erroneously sued as* Tokio Marine HCC – Medical Insurance Services Group) (collectively, the "HCC Defendants") will and hereby do move this Court for an order dismissing the Complaint filed by plaintiffs Mohammed Azad ("Azad") and Danielle Buckley ("Buckley") (collectively, "Plaintiffs") pursuant to Federal Rule of Civil Procedure 12(b)(6).  The motion is made on the ground that Plaintiffs' Complaint, and each Count therein, fails to state a claim upon which relief can be granted, and fails to meet the pleading standards of Federal Rules of Civil Procedure 8(a)(2) and/or 9(b), as applicable.  The motion is based on this Notice of Motion and Motion, the included Memorandum of Points and Authorities in Support, the Declarations of Jon Padgett, Dan Garavuso and Sumera Khan filed herewith, the Proposed Order filed herewith, all pleadings and papers filed herein, arguments of counsel, and any other matters properly before the Court.[1]

## ISSUES TO BE DECIDED

1.      Whether to dismiss Plaintiffs' Counts based on the theory that the HCC Defendants misrepresented and/or failed to adequately disclose the preexisting conditions exclusion in the Short Term Medical insurance policies purchased by Plaintiffs for failure to state a claim upon which relief can be granted.

2.      Whether to dismiss Plaintiffs' Counts based on the theory that the HCC Defendants unfairly and unreasonably denied Plaintiffs' claims for policy benefits and/or otherwise engaged in improper claims-handling practices, for failure to state a claim upon which relief can be granted.

---

[1] In the event that the Court does not dismiss Plaintiffs' Complaint in its entirety pursuant to Rule 12(b)(6) for failure to state a claim, the HCC Defendants concurrently file an alternative motion to strike Plaintiffs' class action allegations pursuant to Rules 12(f), 23(c)(1)(A) and 23(d)(1)(D).

DOCUMENT PREPARED
ON RECYCLED PAPER

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Plaintiffs' Complaint contains multiple Counts, but all rely on two theories of misconduct:

(1)    That the HCC Defendants falsely advertised their Short-Term Medical ("STM") insurance by misrepresenting and/or failing to adequately disclose that it excludes coverage for preexisting conditions that were diagnosed or treated within the six months prior to the effective date of coverage; and

(2)    That the HCC Defendants employed (and misrepresented they did not engage in) improper claims-handling practices.

However, Plaintiffs fail to state a claim under either of these theories.

Plaintiffs' false advertising/misrepresentation theory fails because the preexisting conditions exclusion was repeatedly disclosed prior to Plaintiffs' purchases. Plaintiffs identify a single exemplar "brochure" available on the HCC website that they contend inadequately disclosed that the STM policy excluded preexisting conditions, but ignore all the other materials that disclosed that exclusion. And, neither plaintiff alleges they saw or relied on that brochure to make their purchase decision. Moreover, given the information in that brochure or otherwise available to Plaintiffs prior to purchase (including numerous materials on the HCC website expressly disclosing the preexisting conditions exclusion), no reasonable consumer could have been misled as to the preexisting conditions exclusion.

Plaintiffs' improper claims-handling theory fails because the facts alleged do not support a conclusion that either Azad's or Buckley's claim was improperly handled, delayed or denied, let alone denied based on the preexisting conditions exclusion. As to both Azad and Buckley, the allegations reflect that they and/or their medical providers failed to produce necessary records requested by HCC. Thus, HCC simply advised Plaintiffs that it was awaiting receipt of the requested medical records and that, upon receipt of such records, their claims would be reopened. California law recognizes that a health insurer need not pay a claim when it has not received sufficient records for a proper evaluation. Finally, as to Plaintiffs' conclusory assertion that HCC trained claims representatives to "deceive," "discourage" and "obstruct" claimants from pursuing claims, neither Azad nor Buckley alleges any facts to indicate HCC's representatives discouraged

1    or obstructed them from pursing their claims and, indeed, each has pursued their claims.

2         Accordingly, Plaintiffs' Complaint should be dismissed as to each Count asserted.

3    I.   **Summary of Plaintiffs' Claims and Factual Allegations**

4         Plaintiffs Azad and Buckley purchased HCC's STM insurance on or about December 8,

5    2015 and April 1, 2016, respectively.  (Complaint ("Compl.") ¶¶ 19, 29.)[2]  HCC Life Insurance

6    Company issues the Certificates of coverage, and they are administered by HCC Medical

7    Insurance Services LLC.  (*See id.* ¶¶ 15-16.)  The STM product is excluded from Affordable Care

8    Act mandates and provides health coverage for periods of short duration less than 12 months, as

9    provided by applicable state law, with varying deductible and maximum coverage options.  (*See

10   id.* ¶ 40; Declaration of Jon Padgett ("Padgett Decl") ¶ 5 and Exs. 3-6; *see also* 42 U.S.C. §

11   300gg–91.)  STM buyers include "individuals between jobs, new hires, early retirees, recently

12   naturalized citizens, and recent college graduates."  (*See* Compl. ¶ 22 n. 5).  Consumers may

13   purchase HCC's STM product directly through HCC or through an HCC appointed producer.

14   (*See id.* ¶¶ 15-17, 22, 39.)  During 2015-2016, defendant Health Insurance Innovations, Inc.

15   ("HII") was one of a number of many such licensed and appointed insurance producers

16   authorized to market and sell HCC's STM product along with those of other insurers.  (*See id.*;

17   Declaration of Dan Garavuso ("Garavuso Decl.") ¶¶ 1-2.)

18        Plaintiffs assert five Counts related to the defendants' issuance, marketing, and

19   administration of the STM product: (1) "unlawful, fraudulent and unfair" practices in violation of

20   the Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.* (the "UCL"), (2) false

21   advertising in violation of Bus. & Prof. Code § 17500 *et. seq.* (the "FAL"), (3) breach of contract,

22   (4) breach of the implied covenant of good faith and fair dealing, and (5) "unjust enrichment."[3]

---

23   [2] At that time, STM coverage was issued in California as a group policy through Consumer

24   Benefits of America ("CBA"), with insureds receiving individual Certificates that contained
     detailed terms and conditions of coverage and also incorporated the group policy.  (*See* Compl. ¶¶

25   18, 57; *see also* Padgett Decl. ¶¶ 1, 7 and Ex. 7.)  Plaintiffs' Complaint uses the word "policy" to
     refer to both the CBA group policy and the individual Certificates.  As Plaintiffs' allegations

26   relate to the terms and conditions of the Certificates, this motion refers to them as "Certificates."

27   [3] HCC's STM policy and Certificates are governed by Missouri law.  (Padgett Decl. Ex. 7.)  But,
     for purposes of this motion, it is not necessary for the Court to conduct a conflict of laws analysis,

28   as Plaintiffs' claims are subject to dismissal even if California law is assumed to apply.

1    (Compl. ¶¶ 90-146.)   These claims are brought on behalf of a putative class of either all

2    California policyholders or all California insureds whose claims for benefits were denied, for an

3    unspecified period of time.  (*Id.* ¶ 82.)

4         A.   **Plaintiffs' theory that the preexisting conditions exclusion was misrepresented**
              **is belied by the Complaint and materials incorporated by reference therein**
5

6         Plaintiffs' UCL and FAL Counts are primarily based on the theory that pre-sale marketing

7    materials and oral statements disseminated by the HCC Defendants or their producers, read in

8    conjunction with the STM application, materially misrepresented the policy's exclusion of

9    coverage for preexisting conditions.  (*Id.* ¶¶ 19-22, 39-54, 93-97, 105-113.)[4]  But, Plaintiffs do

10   not identify any specific misrepresentation made to or relied on by either Azad or Buckley's

11   husband (who allegedly made the purchase).  As to the Buckleys, the Complaint does not identify

12   any representation or omission that was made to or relied on by them.  (*Id.* ¶¶ 29-38, 40-47, 50-

13   54, 99.)  And, as to Azad, Plaintiffs assert that "the application process was entirely verbal, with

14   all representations regarding the policy being made to Azad over the phone," but they do not

15   identify any specific alleged misrepresentation or omission made to or relied on by him during

16   that phone call.  (*Id.* ¶¶ 19-20, 50-54, 99.)

17        The Complaint instead focuses on an "exemplar brochure" located on the HCC website

18   "under the tab 'Brochures,' subtab 'STM Complete,' and subtab 'CA'."  (*Id.* ¶¶ 42-44.)  Plaintiffs

19   claim that this brochure, when "read in conjunction with the application," would "lead a

20   consumer to believe" that, unless the applicant had been treated within the past five years for the

21   specific medical conditions asked about in the portion of the application addressing whether the

22   applicant was "eligible" to obtain the policy, there would be no other preexisting conditions

23   exclusions and all treatment would be covered.  (*Id.* ¶¶ 40-47, 49.)  However, the Complaint does

24   not allege that either of the named plaintiffs saw, let alone read and relied on, that brochure to

25   make their purchase decisions.  (*See id.* ¶¶ 19-20, 29, 40-47, 99.)  Indeed, neither plaintiff alleges

26   they went to the HCC website at all.

27

28   _____
     [4] The 5th Count, for unjust enrichment, is stated to be an "alternative" to those.  (*Id.* ¶¶ 141-145.)

Further, Plaintiffs' singling out one document to claim that the HCC Defendants tried to hide the preexisting conditions exclusion is belied by numerous other materials that were readily available on the HCC website.  To begin with, Plaintiffs ignore the primary consumer-facing materials on the website at that time—in particular, the "Short-Term Medical Insurance" product description page—which prominently warned of the preexisting conditions exclusion, stating immediately under the product heading:

> **Please note, our Short Term Medical insurance is intended for temporary gaps in health insurance.  It is not compliant with the federal Affordable Care Act and *does not cover expenses related to pre-existing conditions*.**

(Padgett Decl., ¶¶ 4-5 and Exs. 3-5) (emphasis in original and additional emphasis added).

This product description page on the HCC website was more readily accessible to potential purchasers than the exemplar brochure emphasized by Plaintiffs.  First, a consumer visiting HCC's website would get to this product description page by simply navigating to the "Products" tab, and clicking on "Short-Term Medical."  (*Id*. Ex. 3.)  Second, a consumer on the HCC homepage who merely read the very first heading asking "Affordable Short Term Insurance – which best describes you?," looked to part of the page for "U.S. Residents," and clicked on "Tell Me More," would immediately reach the same product page with the prominent warning that the STM policy "does not cover expenses related to pre-existing conditions."  (*Id*. Ex. 4.)  Third, at the time of Buckley's purchase, from the homepage, clicking on the "Products" heading would take users to a "Travel Health Plans and Short Term Insurance" summary page and, by clicking on the "Short Term Medical" hyperlink, users would again reach the "Short-Term Medical" product page with the preexisting condition warning.  (*Id*. ¶ 5 and Ex. 5.)

Similarly, if a prospective purchaser had visited that "Short-Term Medical" product page and was interested enough to click through the "Select Your State" box to choose California, the next page that appeared—headed "California Short Term Medical Insurance Plans"—also explicitly disclosed the preexisting conditions exclusion, under the heading "Limits and Considerations of STM Coverage."  (*Id*. ¶ 6 and Ex. 6.)  Neither Azad nor Buckley alleges that they did not see (or were prevented from reviewing) these "Products" pages—including their

- 5 -

1  explicit disclosures of the preexisting conditions exclusion.

2  Plaintiffs concede that the STM policy Certificate was publicly available on the HCC

3  website and clearly excluded coverage for preexisting conditions treated or diagnosed within the

4  prior six months.  (*See* Compl. ¶¶ 40, 54; *see also* Padgett Decl. ¶ 7 and Ex. 7, p. 18.)  Plaintiffs

5  contend, however, that the HCC defendants made the Certificate "difficult to locate" on the

6  website, to prevent customers from learning of the preexisting conditions exclusions prior to

7  purchase or at least in time to exercise the 10 day right to cancel.  (Compl. ¶¶ 22-23 and 54.)

8  Plaintiffs' conclusory assertion is belied by the fact that the California STM product page of

9  HCC's website, in addition to expressly warning that "pre-existing conditions [are] excluded,"

10  had the following invitation with a hyperlink to the California form Certificate:

11
12  Get more details regarding all the benefits available in California with our short
     term medical insurance plan by **reviewing the full policy documents here**.

13  (Padgett Decl., ¶ 7 and Exs. 7-8.) (bolding reflects hyperlink in original).

14  Moreover, neither Azad nor Buckley alleges they sought, but could not find, a copy of the

15  Certificate on the HCC website prior to purchase.

16  By contrast, at the time of Plaintiffs' purchases, in order to find the brochure, a consumer

17  would need to follow a longer, multiple-step process through the "Producers" or "Customer

18  Service/Claim Forms" tabs of the website.  (*Id*. ¶ 8 and Exs. 9-10.)  Neither Azad nor Buckley

19  alleges that they took this pre-purchase route through the HCC website to locate the brochure.

20  Finally, Plaintiffs concede that the preexisting conditions exclusion is referenced in the

21  application and the applicant must sign an acknowledgment thereof, which states that "I

22  understand this insurance contains a Pre-existing Condition exclusion."  (*See* Compl. ¶¶ 40-41,

23  45-47.)  But, Plaintiffs assert that consumers could have interpreted a different sentence in the

24  application ("I understand that the information contained herein is a summary of the coverage

25  offered in the [policy]…"), when read "in conjunction" with the exemplar brochure, to mean that

26  the scope of the preexisting conditions exclusion was limited to conditions "summarized" in the

27  application – *i.e.*, to mean that only the specific conditions listed in the medical questions

28  governing "eligibility" for the policy were excluded from coverage.  (*See id.* ¶ 47).  Neither Azad

nor Buckley alleges ever seeing the brochure or reading it "in conjunction with" the application. Nor do either Azad or Buckley allege that because their applications stated that the information contained in it was a "summary of the coverage," they were confused into believing that their signed acknowledgement that the Certificate "contains a Pre-Existing Conditions Exclusion" somehow referred solely to the specific conditions listed in the "medical questions" section of the application. (*See id.*; *see also* Padgett Decl. ¶ 9 and Ex. 12.)

1.    **Additional details of Azad's purchase demonstrate he was not misled**

Azad's allegations regarding his specific purchase reflect he received several additional disclosures that preexisting conditions were excluded.  First, Azad alleges that "after conducting an online search for health insurance" he was "directed to the website for a broker, Insurance Care Direct (http://www.insurancecaredirect.com)."    (Compl. ¶ 19.)    That website's tab describing Short Term Insurance explicitly explained that, under such policies, "pre-existing conditions are not covered." (Declaration of Sumera Khan ("Khan Decl.") ¶¶ 2-3 and Ex. 1.)

Second, Azad alleges that his "application process was entirely verbal, with all representations regarding the policy being made to Azad over the phone."  (Compl. ¶ 20.) Notably, Azad does not identify any representation made to him during that phone call that preexisting conditions would be covered by HCC.  In fact, the recording of the phone call made under the direction of the independent selling agency verifies that Azad was explicitly advised of and assented to the preexisting conditions exclusion.  (Garavuso Decl. ¶ 2 and Ex. A; Khan Decl. ¶ 4 and Ex. 2 , pp. 2-4.)

Third, Azad alleges that, upon completing and submitting his application, on December 8, 2015, he received an email confirming that coverage had been issued, advising that he had ten days to cancel, and instructing him how to create an online account.  (Compl. ¶¶ 22-23 and n. 6.) Indeed, that email, along with instructing him how to access the "plan documents" online, advised Azad that "[t]o learn more about how your plan works, click here," with a hyperlink to a one and a half minute video that, among other things, explained the preexisting conditions exclusion.  (*See id*. ¶ 23; Garavuso Decl. ¶¶ 3-4 and Ex. B; Padgett Decl. ¶ 10 and Ex. 14.)

DOCUMENT PREPARED
ON RECYCLED PAPER

## 2. Buckley alleges no facts to indicate her husband was misled

Plaintiffs allege no facts about Buckley's transaction, other than that: (i) Buckley's husband made the purchase; and (ii) did so on or about April 1, 2016. (Compl ¶¶ 9, 29.) Plaintiffs do not identify **any** specific alleged misrepresentation or omission made to or relied on by the Buckleys. (*See id.* ¶¶ 29-38, 40-47, 53-54, 99.) Further, because the Buckleys purchased online (through Healthy Halo Insurance Services, Inc.), the next day they were emailed a "fulfillment" package with their payment receipt, insurance cards, their policy Certificate and application, and information about CBA. (Padgett Decl. ¶ 11 and Ex. 15.) It also included a cover letter advising the Buckleys that they could cancel "for any reason" within ten days and explicitly disclosing the preexisting conditions exclusion twice:

> (i)      stating that "[t]he coverage contains exclusions for specific conditions and treatments as well as a pre-existing conditions exclusion;" and

> (ii)      stating in a separately headed section titled "**Pre-Existing Conditions**" that: "charges resulting directly or indirectly from any pre-existing condition are excluded from this insurance."

(*Id.*) (emphasis in original).

## B. Plaintiffs' unfair claims handling practices theory

Plaintiffs also assert various unfair claims-handling practices as the basis for their breach of contract and bad faith Counts, and incorporate those allegations (and the HCC Defendants' alleged failure to disclose such practices) in their UCL, FAL and "unjust enrichment" Counts. In particular, Plaintiffs allege that the HCC Defendants unfairly and unreasonably denied or delayed payment of Plaintiffs' claims for policy benefits and did so pursuant to a scheme of:

> (1)      making unreasonable demands for medical records;

> (2)      representing claims would be resolved within 45 days, when that was "difficult or impossible" to do based on HCC's cumbersome records request processes; and

> (3)      training claims representatives ("CSRs") to "deceive," "discourage" and "obstruct" claimants from pursuing claims.

(Compl. ¶¶ 3, 25-28, 33-36, 58-73.)

DOCUMENT PREPARED
ON RECYCLED PAPER

1    Azad alleges that almost immediately after buying his policy on December 8, 2015, he

2    visited St. Rose Hospital's emergency room three times in the next two weeks, for a panic attack,

3    chest pains, and a vasovagal syncope.  (Compl. ¶¶ 19, 25 and n. 6.)  Azad alleges that HCC

4    requested certain of his medical records in order to process his claims for these visits.  (*Id.* ¶ 26;

5    *see* Padgett Decl. ¶ 12 and Exs. 16-18.)  But, Azad does not allege that the two medical providers

6    from whom records were requested fully responded, that he attempted to get his records from

7    them, or that the requisite records were ever produced to HCC.  Nor does the Complaint allege

8    that HCC actually denied Azad's claims, as opposed to abating the claims until the requested

9    records were received.

10    As for Buckley, the Complaint alleges that after she submitted claims in June 2016, HCC

11    requested records from the urgent care facility where she was treated and from her primary care

12    physician.  (Compl. ¶¶ 31-33.)  However, Buckley does not allege that her primary care

13    physician's records were ever produced to HCC, and concedes that her claims were closed "due

14    to a lack of requested information from the providers(s)."  (*Id.* ¶¶ 33-36.)  The explanation of

15    benefits letters referenced in the Complaint stated that Buckley's claims would be reopened

16    should a "complete copy of medical records" be provided."  (Padgett Decl. ¶ 13 and Ex. 19].)

17    Thus, Buckley does not deny that HCC merely abated the process until it received the necessary

18    documents to evaluate her claims.  And, in any event, the amount of Buckley's claims, $3,500,

19    was substantially less than her $7,500 deductible.  (*Id.* Ex. 15, Part X, p. 28; Compl. ¶ 38.)

20    Further, the Complaint does not allege that any of HCC's CSRs deceived, discouraged, or

21    obstructed either Azad or Buckley from pursuing their claims.  Instead, Azad alleges that when he

22    "called the customer service number for HCC," he was "told to provide more" information so that

23    HCC could process his claim, and Buckley does not allege that she ever contacted or spoke with a

24    CSR.  (*See* Compl. ¶¶ 27, 29-38.)

25    ## ARGUMENT AND AUTHORITIES

26    **II.   Standard of Decision for Motion to Dismiss**

27    The Court must dismiss a cause of action pursuant to Fed. R. Civ. P. 12(b)(6) where the

28    complaint fails to allege "enough facts to state a claim to relief that is plausible on its face," and

DOCUMENT PREPARED
ON RECYCLED PAPER

1   raise "a right to relief above the speculative level." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d

2   1152, 1159 (9th Cir. 2012), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.

3   Ct. 1955 (2007).  To do so, a plaintiff must plead more than just "ultimate facts" and "legal

4   conclusions," but must also "plead the necessary evidentiary facts to support those conclusions."

5   *Kendall v. VISA USA, Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008).  The court does not accept as

6   true allegations that are "merely conclusory, unwarranted deductions of fact, or unreasonable

7   inferences."  *Spreewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

8          Further, the "incorporation by reference" doctrine permits a Court deciding a Rule 12

9   motion to consider materials not attached to the complaint "without converting the motion to one

10  for summary judgment," when: (1) the complaint "refers extensively" to such materials or their

11  content is "central to" plaintiffs' claims, and (2) no party questions their authenticity.  *Davis*, 691

12  F.3d at 1159-60, citing *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) and *U.S. v. Ritchie*,

13  342 F.3d 903, 908 (9th Cir. 2003).  When this test is met, the Court "may treat such a document

14  as part of the complaint," and assume as true the document's contents instead of contrary

15  allegations in the complaint.  *Davis*, 691 F.3d at 1158-61 (dismissing action alleging UCL and

16  FAL claims based on "disclosure documents" on defendants' website or delivered to plaintiffs

17  that were referenced in, but not attached to, the complaint); *Knievel*, 393 F.3d at 1076 (dismissing

18  action on Rule 12 motion based on the contents of other pages of the defendants' website

19  surrounding the page that plaintiffs had attached to the complaint); *Branch v. Tunnel*, 14 F.3d

20  449, 453-54 (9th Cir. 1994) (dismissing action based on prior testimony and affidavit deemed

21  incorporated by reference that contradicted allegations in the complaint); *United States v. Safran*

22  *Grp., S.A.*, 2017 U.S. Dist. LEXIS 8408, at *2-4 and n. 1, 2017 WL 235197 (N.D. Cal. Jan. 19,

23  2017) (where plaintiffs' allegations of defendants' corporate status and operations were "largely

24  obtained" from the company website, the court considered on a Rule 12 motion the contents of a

25  brochure that was "available on" the website but not referred to in the complaint.)

26          Here, given the centrality to Plaintiffs' claims of: (i) the representations contained in the

27  documents that were available on HCC's or Insurance Care Direct's websites (*see* Compl. ¶¶ 19,

28  40-47, 49, 54); (ii) Plaintiffs' applications and Certificates (*see id.* ¶¶ 20-23, 40-41, 49, 54); (iii)

1  and the telephonic or written communications between Plaintiffs and HCC's alleged agents (*see*

2  Compl. ¶¶ 20-21, 26-27, 33-36), the Court should consider incorporated by reference the various

3  materials described in and attached to the declarations filed herewith, including the numerous

4  pages on the HCC website that disclosed the preexisting conditions exclusion.

5  **III.   Plaintiffs' 1st Count Fails to State a Claim Under any Prong of the UCL**

6  The UCL proscribes business practices that are "fraudulent," "unlawful," or "unfair."  Cal.

7  Bus & Prof. Code § 17200.[5]  Plaintiffs' 1st Count asserts violation of each prong of the UCL.

8  (Compl. ¶¶ 90-103.)  However, Plaintiffs fail to state a claim under any of those provisions.

9  **A.   Plaintiffs' UCL "fraud" claim fails**

10  Plaintiffs' UCL fraud theory—that the HCC Defendants misrepresented and/or failed to

11  disclose the preexisting conditions exclusion—fails in multiple respects.  First, the claim fails

12  because Plaintiffs fail to satisfy the particularity requirements of Rule 9(b).  Second, the facts

13  alleged or incorporated establish that no reasonable consumer could have been misled by the pre-

14  sale materials or oral representations as to the existence or nature of the preexisting conditions

15  exclusion.  Third, the named Plaintiffs each fail to allege facts sufficient to establish that they

16  actually and reasonably relied on the alleged misrepresentations or omissions as to the existence

17  of the preexisting conditions exclusion.

18  **1.   Substantive standards for pleading UCL fraud claims**

19  A business practice is "fraudulent" under the UCL if a "reasonable consumer" is "likely to

20  be deceived" by the alleged misrepresentations or omissions.  *Davis*, 691 F.3d at 1168-69;

21  *Puentes v. Wells Fargo Home Mortg., Inc*., 160 Cal. App. 4th 638, 645 (2008).  However, a

22  "representation does not become 'false and deceptive' merely because it will be unreasonably

23  misunderstood by an insignificant and unrepresentative segment of the class of persons to whom

24  the representation is addressed."  *Davis*, 691 F.3d at 1162  (citations omitted).

25  Further, a plaintiff alleging UCL claims sounding in fraud must satisfy the Fed. R. Civ. P.

26

27  [5] Missouri law similarly prohibits any "deception" or "unfair practice" in the advertisement or
sale of any merchandise, and allows anyone who suffered "an ascertainable loss of money or

28  property" as a result to bring suit.  R.S. Mo. §§ 407.020- 407.100.

9(b) requirement to plead the underlying facts with specificity. *See, e.g.*, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125-27 (9th Cir. 2009); *Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 850 (N.D. Cal. 2012). To satisfy Rule 9(b), plaintiffs must set forth the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations," although the standard is relaxed as to claims based on alleged omissions, since it is not possible to plead a "specific time" or "place." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007); *Washington v. Baenziger*, 673 F. Supp. 1478, 1482 (N.D. Cal. 1987).

In addition, the California Supreme Court has held that at least the named plaintiffs in a putative class action alleging violation of the UCL must "demonstrate actual reliance on the allegedly deceptive or misleading statements" in accordance with the standards for an "ordinary fraud" claim. *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009).

### 2. **Plaintiffs fail to meet the Rule 9(b) pleading requirements**

Plaintiffs allege literally no facts regarding the circumstances of the Buckleys' purchase: they identify no documents containing affirmative misrepresentations or material omissions regarding the preexisting conditions exclusion allegedly received by the Buckleys prior to purchase, nor do they identify any alleged oral misrepresentations made to the Buckleys. (Compl. ¶ 29.) The Complaint also identifies no written or oral misrepresentations or omissions allegedly made to Azad. (Compl. ¶ 19-20.) Rather, it asserts that "all representations regarding the policy [were] made to Azad over the phone," but fails to allege any specific misrepresentations or omissions were made concerning the policy, let alone any regarding the preexisting conditions exclusion. And, as detailed above, the transcript of the call which Azad references in his Complaint demonstrates he was told of the preexisting conditions exclusion. Thus, Plaintiffs fail to satisfy the Rule 9(b) requirement to set forth the "time, place and specific content" of the alleged misrepresentations made to Buckley and Azad.

### 3. **Plaintiffs' UCL fraud claim fails because no reasonable consumer could have been misled as to the preexisting conditions exclusion**

Plaintiffs' UCL fraud claim fails because the pre-purchase materials available did not misrepresent and, in fact, clearly disclosed, the preexisting conditions exclusion. As detailed

28094085.16
- 12 -
Case No.: 4:17-cv-00618-PJH
HCC LIFE INSURANCE COMPANY AND HCC MEDICAL INSURANCE SERVICES, LLC'S
NOTICE OF MOTION AND MOTION TO DISMISS
DOCUMENT PREPARED
ON RECYCLED PAPER

above, Plaintiffs' fraud/false advertising theory hinges on two central factual allegations:

- That an "exemplar brochure" available on the HCC website (which neither Azad nor Buckley alleges reading) and the STM application, when "read together," would lead reasonable consumers to believe that only those specific medical conditions listed in the application as impacting an applicant's eligibility for the policy were subject to a preexisting conditions exclusion; and

- That HCC made a sample STM Certificate "difficult to locate" on the website, so as to prevent potential buyers from discovering the actual preexisting conditions exclusion until it was too late. (*See* Compl ¶¶ 40-47, 49, 53-54.)

Plaintiffs' theory fails in numerous respects.

First, Plaintiffs erroneously conflate the issue whether one is "eligible" for the STM policy at all (the subject of the medical history questions in the application and the "eligibility" section in the brochure) with whether a given medical condition or particular treatment for such condition is covered under the policy.  In short, if an applicant was treated during the past five years for any of the specific medical conditions asked about in the "medical questions" portion of the application (*e.g.*, cancer, stroke, heart attack, etc.), then he or she is simply not "eligible" to obtain the policy — as the application puts it, in that circumstance "coverage cannot be issued" at all.  (*See* Padgett Decl. Ex. 12 and Ex. 13, Part II, p. 7.)  This is a far different and distinct issue from the preexisting conditions exclusion, which does not render any person entirely "ineligible" for coverage but, rather, merely excludes from coverage any medical conditions for which the insured had been treated during the prior six months.  (*Id.* Ex. 13, Part VI, p. 18.)  The subjects are simply unrelated and nothing in the brochure or application supports Plaintiffs' conclusory assertion that reasonable consumers would conflate these two different issues so as to believe that, as long as he or she met the conditions to be "eligible" for the policy then all subsequent medical treatment would be covered without any other preexisting conditions exclusion.

Second, Plaintiffs ignore the numerous other materials that were available to prospective purchasers pre-sale, including on the very website that contained the brochure, that expressly disclosed the preexisting conditions exclusion.  In particular, Plaintiffs mention the HCC website,

but wholly ignore the numerous product description pages detailed above (at that time accessible via both the "Products" tab of the HCC website and by clicking on the "Tell Me More" button on the homepage) that each explicitly and prominently warned that the STM policy "**does not cover expenses related to pre-existing conditions**." (Padgett Decl., ¶¶ 4-6 and Exs. 3-6) (emphasis in original). In addition, Plaintiffs cannot escape the fact that the California STM product page invited them to "get more details" by "reviewing the full policy documents here," and hyperlinking to the form Certificate with the preexisting conditions exclusion (*see id*. ¶¶ 6-7 and Exs. 7-8), with a conclusory assertion that the policy was "difficult to locate." (Compl. ¶ 54.)

Plaintiffs' characterization of the structure of the HCC website and the effect it would supposedly have on a reasonable consumer is not supported by any well-pleaded facts. To the contrary, as detailed above, it was easier for a prospective purchaser to find numerous materials (from either the HCC website homepage or on the "Products" tab) that explicitly disclosed the preexisting conditions exclusion than it would have been to navigate through the "Producers" or "Claim Forms" tabs of the website to find and download the exemplar brochure. (*See* Padgett Decl. ¶¶ 2-8 and Exs. 1-10.) Thus, HCC did not conceal and, in fact, affirmatively and repeatedly disclosed the preexisting conditions exclusion and made it easy for anyone to find on the very website that contained the brochure emphasized by Plaintiffs. Plaintiffs allege no facts to indicate that any "reasonable consumer" was tricked into skipping over the multiple locations on the HCC website that disclosed the preexisting conditions exclusion in order to download the brochure.

Third, the brochure Plaintiffs cite is not misleading. It notified prospective purchasers that "[a]ctual coverage will vary based on the terms and conditions of the policy issued," that "[i]n the event that a policy is inconsistent with the information described herein, the language of the policy will take precedence," and directed consumers to "[p]lease see the policy for detailed information about these and other policy exclusions and limitations." (*Id.* ¶ 8 and Ex. 11.) Thus, a reasonable consumer reviewing the brochure understood that its content did not constitute the entirety of the policy terms, would be alerted to read the policy for additional exclusions or limitations, and could readily locate the preexisting conditions exclusion by reviewing either the form Certificate or the Products pages of the HCC website. *See McColgan v. Mut. of Omaha Ins.*

1   *Co.*, 4 F.Supp. 3d 1228, 1234 (E.D. Cal. 2014), citing *Hadland v. NN Investors Life Ins. Co.*, 24

2   Cal. App. 4th 1578, 1586-88 (1994) ("it is unreasonable for one to assume that the full details of

3   an insurance policy will be detailed in one small paragraph on an application form," as California

4   "courts have found that a reasonable person will read the terms of an insurance policy to

5   determine the extent of its coverage.")  And, in any event, neither Azad nor Buckley alleges they

6   reviewed or relied on the brochure.

7          Fourth, the application form explicitly disclosed and required that the applicant

8   acknowledge that "I understand this insurance contains a Pre-existing Condition exclusion."

9   (Padgett Decl. Ex. 12.)   Plaintiffs argue that this disclosure was somehow nullified by the

10  application's statement that the information therein was a "summary of" the STM coverage,

11  because consumers would somehow understand that to mean that the only preexisting conditions

12  excluded were those specifically asked about in the "medical questions" section of the

13  application.  (Compl. ¶¶ 47, 49.)  However, the application is not reasonably susceptible to this

14  interpretation.  The clear and explicit acknowledgment that the applicant understands (i) that the

15  policy "contains a Pre-existing Condition exclusion" and (ii) that the information in the

16  application is merely "a summary of" the policy's coverage cannot be read to suggest to a

17  "reasonable consumer" that a different provision in the application regarding conditions that

18  would render one ineligible for the policy constituted the entirety of its "Pre-existing Condition

19  exclusion."  This is particularly true here because the policy Certificate (including the preexisting

20  conditions exclusion) was readily available for review via the hyperlink on HCC's website.  *See*

21  *Hadland*, 24 Cal. App. 4th at 1586-88; 1578.  Indeed, neither Azad nor Buckley alleges they had

22  such an outlandish, unreasonable interpretation of the application.  Accordingly, Plaintiffs fail to

23  allege facts sufficient to establish that a reasonable consumer would have been misled as to the

24  policy's preexisting conditions exclusions.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937

25  (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss.")

26         The Ninth Circuit's dismissal of a similar UCL fraud claim in *Davis v. HSBC* is

27  instructive.  691 F.3d at 1158-62 and 1168-71.  In *Davis*, plaintiffs alleged that the advertising

28  and online application for a Best Buy co-branded credit card were misleading because they failed

1   to adequately disclose the existence of an annual fee. *Id.* at 1158-59. Best Buy's advertisement

2   did not mention any annual fee, but stated generically that "[o]ther restrictions may apply." *Id.* at

3   1158 and 1162. During the online application process, plaintiff was directed to a page on the

4   website titled "Important Account Credit Terms," whose contents were only partially visible (he

5   needed to scroll down for the full text, including the part mentioning the annual fee, to become

6   visible); however, instead of scrolling down to read the complete terms, plaintiff alleged only that

7   he checked the "I agree" box to complete the application. *Id.* at 1158-59. *Davis* affirmed

8   dismissal of plaintiff's UCL and FAL claims, holding that "no reasonable consumer would have

9   been deceived" by the advertisement "into thinking that no annual fee would be imposed,"

10  because, due to the disclaimer that "other restrictions apply," no "reasonable consumer could

11  have believed that if an annual fee was not mentioned [in the ad] it must not exist." *Id.* at 1162

12  and 1168-69. The Ninth Circuit further held that the application was not misleading because if he

13  had scrolled down through the whole document he would have seen the annual fee disclosure. *Id.*

14  at 1163 (when "the parties to an agreement deal at arm's length, it is not reasonable to fail to read

15  a contract before signing it.")

16      A similar result was reached in *Ford v. Hotwire*, 2008 U.S. Dist. LEXIS 108584, 2008

17  WL 5874305 (S.D. Cal. Feb. 25, 2008), where plaintiff alleged that defendant violated the UCL

18  and FAL by failing to disclose to consumers using its website to book third party hotel rooms that

19  the hotels would impose "mandatory resort fees." *Id.* at *2-6. In that case, Hotwire customers

20  indicated their agreement to its Terms of Use "by clicking a box acknowledging that: 'I have

21  read, understood, and accept'" those terms, which were "accessible via the Hotwire website

22  through a hyperlink" to the complete document, which did disclose to customers that resort fees

23  were not included in Hotwire's charges and could be imposed by the hotels. *Id.* The court held

24  that, under these circumstances, "a reasonable customer is not likely to be deceived" as to the

25  existence of the resort fees and, thus, granted Hotwire's motion to dismiss. *Id.* at * 8-9.

26      In this case, just as in *Davis* and *Hotwire*, Plaintiffs' claims should be dismissed because,

27  based on the totality of the materials available prior to purchase (including the "Products" pages

28  on the HCC website, the hyperlinked copy of the policy Certificate, the disclosures in the

application and the disclaimer in the exemplar brochure), no reasonable consumer could have been misled concerning the preexisting conditions exclusion.

### 4. Plaintiffs fail to allege facts showing they actually and reasonably relied on misrepresentations as to the preexisting conditions exclusion

As discussed above, the named plaintiffs in a UCL fraud putative class action must satisfy the traditional "reliance" elements of an "ordinary fraud" claim. *In re Tobacco II Cases*, 46 Cal. 4th at 306; *Davis*, 691 F.3d at 1163. Here, plaintiffs Buckley and Azad fail to allege facts sufficient to establish either actual or reasonable reliance on the alleged misrepresentations concerning the preexisting conditions exclusion.

Buckley alleges literally no facts regarding her husband's purchase, identifying no written or oral representation (or omission) that was purportedly relied on in entering the purchase. In particular, while the Complaint focuses on a single allegedly deceptive brochure available on HCC's website, **Buckley does not allege that she or her husband ever saw that brochure**. (Compl. ¶¶ 29-38, 40-47, 49, 93-99.) Further, the "fulfillment" package emailed to the Buckleys the day after their purchase expressly advised them both that "preexisting conditions are excluded from this insurance" and that they had 10 days to cancel "for any reason." (Padgett Decl. ¶ 11 and Ex. 15.) Accordingly, the conclusory, generalized allegation that Buckley "relied on the deceptive statements of Defendants as described in this complaint" (Compl. ¶ 99) fails to state a claim on behalf of Buckley. *See Davidson v. Kimberly-Clark Corp.*, 2014 U.S. Dist. LEXIS 110055, *27-30 (N.D. Cal. Aug. 8, 2014) (dismissing plaintiff's UCL fraud claim to the extent based on alleged misrepresentations made in defendant's advertisements or on defendant's website that the plaintiff "does not allege that she saw … let alone that she relied on them in deciding to make her purchase.")

As to Azad, the only sources of any "representations" allegedly made to him identified in the Complaint are: (i) the "Insurance Care Direct" website, and (ii) the telephone call during which he applied for the policy. (Compl. ¶¶ 19-20.) However, Azad never identifies any specific representation or omission made on the Insurance Care Direct website or made orally to him during the phone call. And, as with Buckley, Azad never alleges that he reviewed the exemplar

brochure, so he also cannot claim to have "relied" on it.

Further, even if Azad had seen the brochure, any asserted reliance on it setting forth all the terms and conditions of the policy—and, in particular, relying on it to assume that the preexisting conditions exclusion applied **only** to those specific conditions listed in the application's "medical questions"—would nonetheless fail to state a claim because such reliance would be "manifestly unreasonable" in light of the other disclosures made or available to Azad.  *See Davis*, 691 F.3d at 1163, citing *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 921-22 (2009) (a fraud claim fails if plaintiff's reliance on the alleged misrepresentation "in the light of his own intelligence and information was manifestly unreasonable.")  A plaintiff's claimed reliance may be decided on the pleadings "if the facts permit reasonable minds to come to just one conclusion."  *Davis*, 691 F.3d at 1163; *Blankenheim v. E.F. Hutton  & Co.*, 217 Cal. App. 3d 1463, 1475 (1990).  This is such a case.

Initially, as detailed above, the Insurance Care Direct website that Azad visited expressly disclosed that, under STM policies, "pre-existing conditions are not covered."  (Khan Decl. Ex. 1.)  In addition, during the telephone call Azad refers to in the Complaint he was twice informed of and said he understood that the policy did not cover preexisting conditions (with no mention that such limitation applied only to the specific medical conditions listed in the application).  (Garavuso Decl. Ex. A; Khan Decl. Ex. 2, pp. 2-4.)  Further, if Azad had gone to the HCC website, he would have found readily available on the multiple product description web pages detailed above explicit and repeated warnings that HCC's STM policy excluded coverage for preexisting conditions, and he would also have readily found the hyperlink to the full California policy Certificate.  (Padgett Decl. Exs. 3-8.)  Under these circumstances, Azad's alleged assumption as to the scope of the preexisting conditions exclusion was manifestly unreasonable and, thus, fails to state a claim.  *See, e.g.*, *Davis*, 691 F.3d at 1163-64 (holding that plaintiff's reliance on Best Buy's alleged non-disclosure of credit card annual fee was "manifestly unreasonable" because he could have discovered the fee by scrolling through the disclosure statement on Best Buy's website); *McColgan*, 4 F. Supp. 3d at 1230 and 1234 (holding that accidental death policyholder's alleged reliance on the figure "$500,000" being listed on the

1  application next to the box checked for his selection of benefit amount to conclude that the policy

2  would pay "full benefits" for any type of accidental death was unreasonable, and dismissing

3  action for fraud and bad faith, because such belief was contradicted by the "clear provisions

4  provided in the policy"); *Brown v. Wells Fargo Bank, NA*, 168 Cal. App. 4th 938, 958-59 (2008)

5  (there can be no reasonable reliance where the plaintiff, dealing at arm's length, "had a reasonable

6  opportunity to discover the true terms of the contract" but simply failed to read the contract

7  before signing it.)

8       **B.**     **Plaintiffs' UCL "unlawful" prong claim fails**

9       Plaintiffs' UCL "unlawful" theory is that HCC failed to comply with Cal. Ins. Code

10  section 332, which requires an insurer to communicate in good faith "material facts within [its]

11  knowledge, that the other party had no means" to ascertain.  (Compl. ¶ 94.)  Initially, Plaintiffs

12  allege HCC violated this statute by misrepresenting the preexisting conditions exclusions.  (*Id.* ¶

13  93.)  Thus, this aspect of Plaintiffs' UCL "unlawful" claim is derivative of their "fraud" claim

14  and, therefore, fails for the same reasons.  *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983,

15  992 (S.D. Cal. 2012).

16       Next, without citation to any supporting facts, Plaintiffs allege that HCC violated section

17  332 because it failed to disclose that it "train[ed] customer service representatives to deceive or

18  otherwise obstruct policyholders who attempt to resolve their claims disputes."  (Compl. ¶ 93.)

19  As described in Section I.B above, however, the Complaint does not allege that any CSR

20  deceived or obstructed Azad or Buckley in their attempts to resolve their claims disputes.

21  Accordingly, such allegations cannot support a UCL "unlawful" claim.

22       Plaintiffs further allege that HCC acted unlawfully by failing to disclose that the insurance

23  policies did not include "fair claims processes" or "honest customer service."  (Compl. ¶ 93.)  In

24  support, Plaintiffs allege that "HCC represents that claims . . . will be resolved within 45 days,"

25  when it is "difficult or impossible" to do so based on HCC's "inefficient and time-consuming"

26  process "of gathering and reviewing medical records."  (*Id.* ¶¶ 3, 69-70.)  However, Plaintiffs

27  allege no facts to demonstrate that these practices even occurred, much less were "unlawful."

28       First, Plaintiffs cite no support for the allegation that HCC represented that all claims

would be resolved within 45 days, without regard to whether HCC had received sufficient information and records to enable it to determine that (1) a given claim involves a loss covered under the policy; (2) that the loss is not based on a preexisting condition treated within the 6 months prior to the policy's effective date and, thus, excluded from coverage; or (3) that the claimant did not suffer from a medical condition during the preceding five years that would have rendered him or her ineligible to obtain the policy.  Nor does the Complaint identify where, by whom, or how HCC purportedly made such a representation.  And even if it had, an insurer is not required to automatically pay a claim if it has not yet received sufficient information to determine if it is liable.  Cal. Ins. Code § 10123.13(c) (an insurer may "reasonably contest" a claim when it "has not received a completed claim and all information necessary to determine payer liability for the claim, or has not been granted reasonable access to [such] information….")

Both Azad and Buckley concede that HCC's records requests were still outstanding, and neither alleges that HCC had received all of the information requested from the Plaintiffs' primary care physicians identified in the records of their respective emergency room/urgent care treatment necessary in order to evaluate their claims.  *See, e.g.*, Compl. ¶¶ 27-28 (alleging that HCC sought information from Azad, with no allegation that the requested information was returned); *id.* ¶¶ 35-36 (alleging that HCC closed Buckley's claims "'due to a lack of requested information from the provider(s)'").  Plaintiffs cite no law requiring an insurer to pay a claim if a claimant's medical providers, as here, fail to respond to requests for documents.  And while medical providers are required by law to provide records to **their patients** upon request, they are not legally compelled to provide records to insurers.  *See* Cal. Health & Safety Code § 123100 *et. seq.*  An insurer's request (to either or both of the claimant or the medical provider) for the records necessary to process a claim could not be "unlawful," because such a rule would starkly conflict with Insurance Code section 10123.13(c), which provides that an insurer need not pay a claim if it has not received "all information necessary to determine payer liability."

Moreover, despite referring to the preexisting exclusions, neither Azad nor Buckley contend (nor could they) that they were denied coverage based on a preexisting condition.  In fact, neither of their claims were denied, let alone denied based on preexisting conditions, but

instead were abated until HCC received the requested information from their medical providers.

### C.   Plaintiffs' UCL "unfair" claim is based on the same alleged misconduct asserted in the fraudulent and unlawful claims and fails for the same reasons

Plaintiffs allege that the same conduct detailed above violates the UCL's "unfair" prong. (Compl. ¶¶ 98-99.)  This claim fails for the same reasons as the "fraud" and "unlawful" claims.

## IV.   Plaintiffs' 2nd Count for False Advertising Fails to State a Claim

Plaintiffs' FAL claim merely repeats and tracks their UCL fraud and unlawful claims. (Compl. ¶¶ 105-114.)   Accordingly, Plaintiffs' FAL Count fails to state a claim for the same reasons detailed above as to their UCL claims.  *See Davis*, 691 F.3d at 1169.

## V.   Plaintiffs' 3rd Count for Breach of Contract Fails

### A.   Plaintiffs fail to allege facts sufficient to constitute breach of contract

While Plaintiffs broadly allege that HCC breached their insurance Certificates, they largely do not cite to specific policy terms that were purportedly breached.  "[D]ismissal of a breach of contract claim is proper if," as here, "it fails to allege any provision of the contract which supports the claim."  *See Hibu Inc. v. Lawrence*, 2013 U.S. Dist. LEXIS 173324, at *6, 2013 WL 6190538 (C.D. Cal. Nov. 25, 2013) (dismissing breach of contract claim where plaintiff did "not sufficiently allege which contract terms were breached," or "how the terms were breached").  *See also Park v. Morgan Stanley & Co.*, 2012 U.S. Dist. LEXIS 22069, at *7-8, 2012 WL 589653 (C.D. Cal. Feb. 22, 2012).

For example, Plaintiffs allege that HCC "forced [them] to perform claims processing functions that were the contractual duties and obligations of" HCC, including obtaining and providing medical records.  (Compl. ¶¶ 26-27, 35, 122.)  However, they identify no authority that HCC had a "contractual duty" to obtain records from medical providers who—as Plaintiffs' providers did here—failed to respond to requests for production.  Such a provision is not only absent in Plaintiffs' policy Certificates, but would also be inconsistent with various medical records statutes that **require** medical providers to make records available to their **patients**, but merely **permit** production of records to **insurers** like HCC.  *See, e.g.*, Cal. Health & Safety Code § 123100 *et seq.* (stating that providers are required to permit patients to inspect and obtain copies

DOCUMENT PREPARED
ON RECYCLED PAPER

of their medical records, but not addressing production of records to an insurance company); Cal. Civ. Code § 56.10(c)(2) (stating that providers may, but are not required to, disclose a patient's medical records to an insurer without an authorization).  Consistent with this allocation of the burden, California law recognizes that an insurer may "reasonably contest" a claim until the requisite medical records are received.  *See* Cal. Ins. Code § 10123.13.  Moreover, Part III of the policy required Plaintiffs to "fully cooperate with [HCC] in [its] administration."  (Padgett Decl., Ex. 13, Part III, p. 8, ¶ 8.B.)  HCC did not breach the policies by advising Plaintiffs that it could not complete evaluation of their claims until either the providers adequately responded to its records requests, or Plaintiffs otherwise obtained and provided the requisite records.

Similarly, Plaintiffs allege that HCC somehow breached the policies by failing to "perform proper investigations, timely process claims, perform customer service obligations in good faith, and make payments required by the policies."  (Compl. ¶ 120.)  But Plaintiffs neither allege any facts nor identify any policy provision indicating that HCC's records requests to their medical providers were not proper, timely, or reasonably necessary in order to investigate their claims and eligibility for coverage.  Without those records, HCC had no obligation to pay the claims, and therefore did not breach the policies.  *See* Cal. Ins. Code § 10123.13.

Where Plaintiffs do identify specific contractual provisions, the Complaint fails to adequately allege facts supporting a breach by HCC.  First, Plaintiffs allege that HCC "violated [its] contractual promise in Part VIII of the Policy, which obligates [HCC] to pay covered losses 'no later than 30 working days' after receiving a proof of loss."  (Compl. ¶ 123.)  Plaintiffs ignore that, pursuant to Part VIII of the Certificate, the proof of loss must be "proper" and, because HCC has never received "proper" proof of loss due to the outstanding medical records requests, neither Plaintiffs' claims have yet become payable.  *See also* Cal. Ins. Code § 10123.13(c).  Second, Plaintiffs allege that HCC also violated Part VIII of the Certificate by denying "the right to request independent medical review" of HCC's claim decisions.  (Compl. ¶ 124.)  However, the Complaint alleges no facts indicating that Plaintiffs ever requested an "independent medical review" of their claim decision, let alone that HCC denied any such request.  (Of course, such a review would not be timely until all medical records were received in any event.)  Accordingly,

1   HCC did not breach the contract.

2        **B.**     **Buckley alleges no cognizable damage resulting from the alleged breach**

3       It is hornbook law that "[a] breach of contract is not actionable without damage."

4 *Bramalea Cal., Inc. v. Reliable Interiors, Inc.*, 119 Cal. App. 4th 468, 473 (2004); *see Keveney v.*

5 *Mo. Military Academy*, 304 S.W.3d 98, 104 (Mo. Banc 2010).  Here, Buckley's claim was for

6 $3,500, well below her $7,500 deductible.  (Compl. ¶ 38; Padgett Decl. Ex. 15, p. 28.)  Thus,

7 Buckley had no right to payment and suffered no damage from HCC's alleged non-payment.  *See*

8 *Cheviot Vista Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 143 Cal. App. 4th 1486, 1495-

9 97 (2006) (holding that where damage to a condominium complex was less than an insurance

10 policy's deductible, the insurer "did not owe benefits" to the insured "under the terms of the

11 policy and, therefore, did not breach the insurance contract based on its adjustment of the claim").

12 **VI.**    **Plaintiffs' 4th Count for Bad Faith Fails Because They Have Not Alleged Facts**
13           **Showing that their Claims Were Unreasonably Investigated or Denied**

14       To state a claim for breach of the implied covenant of good faith and fair dealing, "(1)

15 benefits due under the policy must have been withheld; and (2) the reason for withholding

16 benefits must have been unreasonable or without proper cause."  *Love v. Fire Ins. Exch.*, 221 Cal.

17 App. 3d 1136, 1151 (1990).  Thus, "a claim for bad faith cannot lie where benefits due under the

18 policy have [not] been withheld" (*Mony Life Ins. Co. v. Marzocchi*, 857 F. Supp. 2d 993, 996

19 (E.D. Cal. 2012), or where "a genuine dispute exists over an insured's coverage."  *Keshish v.*

20 *Allstate Ins. Co.*, 959 F. Supp. 2d 1226, 1233 (C.D. Cal. 2013).[6]

21       In support of this claim, Plaintiffs again allege that HCC trained its CSRs "to consciously

22 mislead, obstruct, and delay Plaintiffs seeking payment of claims."  (Compl. ¶ 129.)  But as

23 described in Sections I.B and III.B, neither Azad nor Buckley alleges that any CSRs misled,

24 obstructed, or delayed them while they sought payment on their claims.  Accordingly, no bad

25

26 [6] Missouri does not recognize a first party cause of action for breach of a covenant of good faith
and fair dealing, but its "vexatious refusal to pay" statute permits insureds to potentially recover
27 certain damages beyond those authorized for breach of contract based on a similar substantive
standard to a California bad faith claim.  *See* R.S. Mo. § 375.420; *see also Overcast v. Billings*
28 *Mutual Ins. Co.*, 11 S.W.3d 62, 69 (Mo. Banc 2000).

DOCUMENT PREPARED
ON RECYCLED PAPER

1   faith claim based on alleged CSR training can survive dismissal.

2          Next, Plaintiffs' allegations that HCC "unreasonably denied" their claims, failed to do "a

3   reasonable investigation," and "unreasonably failed to . . . accept or deny coverage . . . in a

4   reasonable amount of time" (Compl. ¶¶ 130-131, 133) all fail to state a bad faith claim for the

5   same reasons detailed with respect to their breach of contract claim.  Plaintiffs allege no facts to

6   support their additional conclusory assertion that HCC failed to "search for and consider

7   evidence" supporting their claims.  (Compl. ¶¶ 134-135.)  Instead, the actual facts demonstrate

8   precisely the opposite: HCC requested the necessary records from one or two medical providers,

9   and Plaintiffs' providers failed to produce them.  *See supra* at Section __.  Plaintiffs identify no

10  authority that a "reasonable" investigation requires an insurer to do more than what they allege

11  HCC has done.  And, as detailed above, while HCC had no power under California law to do

12  more than **request** records from providers, Plaintiffs had the affirmative right to obtain them

13  themselves.  *See* Cal. Health & Safety Code § 123100 *et seq.*  Plaintiffs do not, however, allege

14  that they ever tried to obtain their own medical records from their providers to produce to HCC.

15          *Sierzega v. Country Preferred Insurance Company*, 650 Fed. Appx. 388, 390 (9th Cir.

16  2016) is instructive.  There, an insured argued that her insurer failed to investigate her claim,

17  pointing in part to its failure to procure her "medical records from the providers rather than from

18  [her], resulting in a delay" in paying her claim.  *Id.* at 389.  Upon notice of the claim, the insurer

19  requested records, also sent requests to the medical providers, and notified plaintiff "that some of

20  the providers had not responded."  *Id.* at 390.  The court noted that there was "no evidence that

21  [plaintiff] was unable to obtain her own medical records from the non-responding providers and

22  provide them to" the insurer.  *Id.*  The court held as a matter of law that the insurer acted

23  reasonably in not paying the claim until it had sufficient information.  *Id.*  Here too, HCC sent

24  record requests to Plaintiffs' providers, and notified Plaintiffs when those providers failed to

25  respond.  *See supra* at Sections I.B and V.A.  Plaintiffs do not allege that they even attempted to,

26  let alone were unable to obtain their own medical records from those providers.  At bottom,

27  Plaintiffs provide no authority for the position that HCC breached the covenant of good faith and

28  fair dealing for failing to obtain the requisite records despite repeated requests.

DOCUMENT PREPARED
ON RECYCLED PAPER

**VII.**   **The 5th Count Fails Because "Unjust Enrichment" Is not an Independent Claim and, in Any Event, Is Duplicative of Plaintiffs' Other Claims**

California courts are split on whether a plaintiff can assert "a stand-alone cause of action for unjust enrichment."  *Compare McBride v. Boughton*, 123 Cal. App. 4th 379, 387-88 (2004) ("unjust enrichment is not a cause of action"); *Shersher v. Sup. Ct*, 154 Cal. App. 4th 1491, 1500 (2007) (allowing cause of action).   In any event, federal courts routinely dismiss purported "unjust enrichment" claims that are merely duplicative of statutory (*e.g.*, UCL or FAL) or tort (bad faith) claims.  *See, e.g.*, *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011).

Here, Plaintiffs' "unjust enrichment" Count is duplicative of, and explicitly pleaded as, an "alternative" to their other claims.  (Compl. ¶¶ 141-145.)  As Plaintiffs allege "no facts not already covered by the UCL [and] FAL claims, which already provide for restitution as a remedy," their unjust enrichment claim must be dismissed.  *See Samet v. Procter & Gamble Co.*, 2013 U.S. Dist. LEXIS 86432, at *37, 2013 WL 3124647 (N.D. Cal. June 18, 2013).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' individual Counts should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: April 13, 2017

GERARD G. PECHT
M. SCOTT INCERTO
JOSHUA D. LICHTMAN
MICHELLE L. MELLO
**NORTON ROSE FULBRIGHT US LLP**


By ___/s/ Joshua D. Lichtman_____
JOSHUA D. LICHTMAN
Attorneys for Defendants
HCC LIFE INSURANCE COMPANY and
HCC MEDICAL INSURANCE SERVICES,
LLC (*erroneously sued as* TOKIO MARINE
HCC – MEDICAL INSURANCE SERVICES
GROUP)

DOCUMENT PREPARED
ON RECYCLED PAPER